222 P.3d 409

**STATE of Hawaiʻi, Plaintiff–Appellee,**

v.

**Jenaro TORRES, Defendant–Appellant.**

No. 28583.

Intermediate Court of Appeals of Hawaiʻi.

Dec. 15, 2009.

As Amended on Reconsideration
Jan. 4 and 7, 2010.

Cynthia A. Kagiwada, on the briefs, for defendant-appellant.

Deirdre Marie–Iha, Deputy Solicitor General, on the briefs, for plaintiff-appellee.

NAKAMURA, C.J., FUJISE, and LEONARD, JJ.

Opinion of the Court by NAKAMURA, C.J.

On May 1, 1992, Ruben Gallegos (Gallegos), a nineteen-year-old cashier for the Pearl Harbor Navy Exchange, was seen prematurely leaving his assigned cashier's cage with Defendant–Appellant Jenaro Torres (Torres). There have been no verified sightings of Gallegos since then. His body has never been recovered.

Gallegos's work assignment on May 1, 1992, was to cash paychecks in a satellite cashier's cage on Pearl Harbor Naval Base

(PHNB). It was Gallegos's first time working alone in a satellite cashier's cage away from the main cashier's office of the Navy Exchange. That morning, Gallegos was given a canvas bag containing $80,000 in cash and escorted by two PHNB police officers to the satellite cashier's cage. A short time later, Torres, who was a PHNB police officer, appeared at the cashier's cage. Torres was wearing his police uniform, even though he was on leave and not scheduled to work that day. Off-duty PHNB police officers were not allowed to wear their uniforms.

Gallegos, carrying the canvas bag, left the cashier's cage with Torres. Federal law enforcement authorities were notified when Gallegos's absence from the cashier's cage was discovered. Later that afternoon, Torres was apprehended by PHNB police as he drove his car onto PHNB. Federal officials searched Torres's car and found a canvas cashier's bag, approximately $78,000 in cash, a .38 caliber revolver, and a stun gun, along with Gallegos's personal belongings, including his wallet, driver's license, base identification card, and hairbrush.

On May 1, 1992, the federal government filed a complaint, charging Torres and Gallegos with theft and Torres with possession of a loaded firearm on a public highway without a license. An amended complaint was filed ten days later charging only Torres, and not Gallegos. Torres pleaded no contest to federal theft and firearm charges and was sentenced to concurrent terms of two years of imprisonment.

On December 7, 2005, thirteen years after the federal charges were filed, Plaintiff–Appellee State of Hawai'i (State) charged Torres by indictment with the second-degree murder of Gallegos, in violation of Hawaii Revised Statutes (HRS) § 707–701.5 (1993).[1] A jury found Torres guilty as charged and also found, pursuant to a special interrogatory, that Torres had possessed, used, or threatened to use a revolver during the com-

mission of the murder. The Circuit Court of the First Circuit (circuit court) sentenced Torres to a term of life imprisonment, with the possibility of parole, and imposed a mandatory minimum term of fifteen years of imprisonment based on the jury's special interrogatory finding. Torres appeals from the Judgment of Conviction and Sentence entered by the circuit court.[2]

On appeal, Torres argues that the circuit court erred in: 1) admitting the incriminating statements Torres made to a co-worker because the statements were not adequately corroborated by independent evidence; 2) denying Torres's motions for judgment of acquittal because the prosecution failed to establish the corpus delicti for murder, where no body was ever recovered; 3) denying Torres's motion to suppress evidence seized from his car; 4) precluding the defense from introducing two documents relevant to Torres's defense; 5) permitting a witness to opine that the gun found in Torres's car had been recently fired, "within the same day, probably eight hours or so"; and 6) instructing the jury on circumstantial evidence.

With one notable exception, we disagree with Torres's arguments and reject them. The one exception is Torres's argument that the circuit court erred in permitting a witness to opine that Torres's gun had been recently fired within a specified time frame. We conclude that the circuit court erred in admitting this opinion testimony and that the court's error was not harmless. Accordingly, we vacate Torres's conviction and remand the case for a new trial.

## BACKGROUND

### I.

Gallegos started working as a cashier at the Pearl Harbor Navy Exchange in December 1991. He was nineteen years old at the time. Gallegos grew up in Texas and came

---

1. HRS § 707–701.5 states:
 **Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

 (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

2. The Honorable Michael A. Town presided over the proceedings relevant to this appeal.

to Hawai'i in August or September 1991 to visit his sister, Blanca Lerma (Lerma), who was in the military. Gallegos decided to stay, and Lerma got permission for Gallegos to live with her family on PHNB. Lerma described Gallegos as a good and responsible person who would let Lerma know where he was at all times.

Lerma testified that she and Gallegos were members of a "close-knit" family of five children and their parents. Lerma and Gallegos would call their parents almost every Sunday, Lerma would see and talk to Gallegos every day, and they "were always together." Lerma did not notice any change in Gallegos's behavior in the days leading up to May 1, 1992. Lerma testified that she and her family have not heard from Gallegos since that date.

On May 1, 1992, Gallegos was assigned to work at the "SUBASE" cashier's cage, a satellite cashier's cage located in Building 693. It was the first time he would be working alone at a satellite location to cash paychecks. Gallegos was described as a quiet, reliable employee. Cashiers would receive advance notice of their assignment to a particular cashier's cage, but this information was not widely disclosed.

Before going to the SUBASE cashier's cage, Gallegos received $80,000 in cash. He placed the money in a standard cash bag along with his wallet and a hairbrush, which he always carried. Gallegos left a set of his personal keys behind at the office.

At around 8:40 a.m., PHNB Police Officer Dennis Crail (Officer Crail) and another officer named Ammons came to escort Gallegos to the SUBASE cashier cage.[3] The three arrived at the SUBASE cashier's cage at around 8:50 a.m. Gallegos entered the cage and locked the door behind him. The officers left the building and returned to their office.

Jeanne Chang (Chang), a Navy Exchange employee, was copying documents that morning at a copier in the hallway near the SUBASE cashier's cage. She saw the two officers escort Gallegos to the cashier's cage and the officers leave after Gallegos closed the door. A few minutes later, another PHNB police officer, whom Chang recognized as Torres, walked past Chang toward the cashier's cage. Torres was wearing his police uniform and a utility belt with a handgun in the holster.

Chang saw Torres knock on the door of the cashier's cage and Gallegos come out, carrying the cash bag. The two men walked past Chang down the hallway in a normal manner without saying anything to each other.

Edmund Higa (Higa), a Navy Exchange employee, was taking his break around 9:00 a.m. outside Building 693. Higa saw two men walking toward the parking area, one was wearing a PHNB police uniform and the other was wearing civilian clothing and carrying a bag. The man with the bag smiled at Higa as he walked by.

## II.

At about 9:40 a.m., Officer Crail was notified that Navy Exchange security claimed that he had dropped Gallegos off at the wrong place because there was no one at the SUBASE cashier's cage. Officer Crail went to meet with Navy Exchange security at the SUBASE cashier's cage and discovered that Gallegos was gone. Officer Crail asked Chang if she had seen the cashier, and Chang replied that the cashier left about ten minutes after Officer Crail had dropped him off. Chang stated that the cashier had left with a PHNB police officer, and she provided a description of the officer that matched Torres. Chang was taken to the PHNB police office and identified a photograph of Torres as the officer she had seen leaving with Gallegos.

According to Officer Crail, PHNB police officers were not permitted to wear their uniforms unless they were on duty. Torres was not on duty on May 1, 1992. PHNB police officers were also required to turn in

---

3. Because of the delay in bringing this case to trial, many of the law enforcement officers and other witnesses had changed employment since the time period relevant to their testimony in this case. Unless otherwise indicated, we will refer to the witnesses by the position they held at the time period relevant to their testimony in this case.

their service weapons to the armory at the end of each shift.

Sometime before 11:30 a.m., an all points bulletin was issued to detain and arrest Torres and Gallegos and to be on the lookout for three cars, including a Chevrolet Celebrity owned by Torres. At about 11:30 a.m. on May 1, 1992, PHNB Police Officer Napoleon Aguilar (Officer Aguilar) was standing guard at the Makalapa Gate entrance to PHNB. Officer Aguilar knew Torres and had been informed that Torres had left the cashier's cage with Gallegos and that no one knew where they were.

At about 2:10 p.m., Officer Aguilar saw Torres in a line of cars entering the base. Torres was driving his Chevrolet Celebrity. Officer Aguilar waived Torres through, then motioned for him to stop. Torres rolled down his window and shook Officer Aguilar's hand. Officer Aguilar reached into the car, turned off the ignition, and grabbed the column shifter. Torres swore at Officer Aguilar, struggled with Officer Aguilar, and attempted to push Officer Aguilar's hand away and start the car. Torres continued to struggle and attempt to drive away even after Officer Aguilar told Torres that the Naval Investigative Service[4] wanted to question Torres about the incident at SUBASE. Eventually, Torres complied with Officer Aguilar's orders to exit the car. Torres was handcuffed and taken to the PHNB police office.

Because Torres's car was blocking traffic, PHNB Police Sergeant James Rozkiewicz (Sergeant Rozkiewicz) moved the car to a nearby parking lot. Sergeant Rozkiewicz checked the interior of the car and the trunk for hazardous or flammable substances and secured the car. While Sergeant Rozkiewicz was attempting to lock the glove compartment, it fell open, revealing a scanner and a .38 caliber revolver.

Federal agents from the NCIS and the Federal Bureau of Investigation (FBI) subsequently searched Torres's car at 7:46 that evening after obtaining authorization to search the car from W.A. Earner, Command-

er of PHNB. In the trunk of the car, the agents found a brown bag used by the Navy Exchange to transport cash. The brown bag contained $77,971.82 in cash, a coin tray, a hairbrush, a key chain, pens, stamps, and a wallet. In the wallet were Gallegos's driver's license, his Navy Exchange identification card, his Bank of Hawaii bank card, his temporary pass to Pearl Harbor, and other papers.

From the car's glove compartment, the agents recovered a .38 caliber Smith and Wesson revolver registered to Torres, a stun gun, and a scanner. A stun gun can immobilize an individual, and prolonged contact could result in loss of consciousness. PHNB police officers did not carry stun guns as part of their official weaponry.

NCIS Special Agent Robert Robbins (Agent Robbins) testified that on May 1, 1992, sometime between 7:00 and 8:00 p.m., he examined the revolver recovered from Torres's car. There were two intact bullets and three spent cartridge casings in the gun. Agent Robbins testified that he believed that the gun had been recently fired, "within the same day, probably about eight hours or so." Agent Robbins based his opinion on the moistness of the powder residue and the absence of any indication of rust on the gun.

In the morning on May 1, 1992, after Gallegos was reported missing, NCIS agents went to canvass Gallegos's neighborhood. The agents then went to the residence Gallegos shared with his sister, Lerma, and obtained Lerma's consent to search the residence. In Gallegos's room, the agents found $440 in cash, a $200 money order receipt, banking documents, and an address book which did not contain an entry for Torres. NCIS Special Agent Wanda Gobin testified that Gallegos's room "looked as if he had planned on returning, all his clothes were there, all his belongings, [and] his money. There was no indication that he was going to leave for any length of time."

At around 1:50 p.m. on May 1, 1992, Torres had been seen at a car wash in Pearl

---

4. By the time of trial, the Naval Investigative Service (NIS) had changed its name to the Naval Criminal Investigative Service (NCIS). For con-

sistency's sake, we will refer to the organization by NCIS, its current name.

City. Torres's Chevrolet Celebrity was "caked in reddish brown dirt[.]" A soil sample was recovered from the fender of Torres's vehicle and analyzed. The analysis indicated the source of the soil was the Waipio Peninsula, located approximately twenty minutes from the Makalapa Gate. NCIS Special Agent Bruce Warshawsky (Agent Warshawsky) described Waipio Peninsula as a "pretty desolate" area of approximately fourteen hundred and fifty acres. In 1998, NCIS agents used cadaver dogs to search areas of the Waipio Peninsula, but nothing was recovered.

Torres's hands were swabbed for gunshot residue after he was arrested, but the State did not introduce evidence that gunshot residue was detected. A test conducted on Torres's car to detect traces of blood was negative.

### III.

In 1995, Susan Davis became acquainted with Torres through phone conversations while she was working in California for Allergan Inc., a pharmaceutical company, and Torres was working for one of Allergan's vendors in Hawai'i. In 1997, Torres told Davis that his mother, who lived in San Diego, was ill. Davis informed Torres about an opening at Allergan in California and helped Torres get the job. During their conversations, Davis shared her Christian beliefs with Torres and Torres said he was a Christian too.

In October of 1997, Torres moved to California and started to work at Allergan. Torres became part of Davis's social group at work and they would go to lunch together with other co-workers.

Davis testified that Torres told her that "there's something that he did and he felt really bad about [it] and didn't know how to deal with it and it was eating at him." He mentioned this to Davis approximately forty or fifty times, and each time Davis advised Torres to look to his faith.

About three months after Torres began working at Allergan, he asked Davis to go to lunch at a Taco Bell. Davis assumed that the normal group of co-workers would join them, but Torres was alone when he met Davis. At lunch at the Taco Bell, Torres thanked Davis for her friendship and all that she had done for him. Torres once again told Davis that he was having difficulty sleeping and coping with something that he wanted to share with her. Davis testified:

> [Torres] said, well, I feel so comfortable talking to you that what I'm about to share with you you're the only one that will know. And he goes I robbed a bank in Hawaii. I said you what? He goes—and I thought he was joking at first and but I still listened, you know, and he goes, yeah, but he goes I served my time.

Torres told Davis that he had needed the money to help his family. He stated that two other people were involved in the robbery and that "something went wrong in the bank[,]" and one of his buddies "[d]id not come back[.]" Torres then told Davis the following:

> He said when he got in the car his buddy said—and he had the money, he says I had the money and he goes I threw it in and the buddy leaned down and then [Torres] at that point said that he thought he was reaching down for a gun and in actuality the buddy was reaching for the money and said I want out. I don't want to be involved in this . . . .
>
> . . . .
>
> He said him and his buddy planned everything of the robbery so—and their game plan was they were going to take the money, go somewhere else, bury it and come back for it later.
>
> . . . .
>
> That's when his buddy said I want out— he went to reach down for the money that [Torres] threw in or whatever and [Torres] thought he was reaching for a gun but the buddy was reaching for the money and said I don't want any of this, I want out. He didn't want to have any part of it.
>
> . . . .
>
> . . . [Torres] said no one back—no one backs out on [Torres] and when he told me at that point I started getting scared.
>
> . . . .

... [H]e goes, as I told you before in the past, I know how to kill ... I've been in the military ... I'm in the police[.]

When Davis asked what happened, Torres told her "don't worry about it. I took care of it." According to Davis, Torres made a gesture with his hand "[l]ike a gun," apparently made a clicking noise, and winked.[5] Torres then told Davis that he put one of his buddies "out of commission" by "paralyz[ing] [the person]" or making it so that the person "will never be able to function." Torres said the game plan was to hide the money and retrieve it later, but Torres had to stop at the military base to get his belongings. Torres said that he was arrested when he went to the military base. When Davis asked Torres if he had killed someone, Torres responded, "I can't answer that now. Don't worry about it. I took care of it." He told Davis that his buddy, "would never be able to come back to tell anyone[.]"

Torres's story terrified Davis. Torres threatened to harm Davis if she told anyone, and he made reference to whether Davis wanted to see her children and family again. Torres also told her that "you're the only one that knows and I'll know if you tell anyone." Davis tried to avoid Torres after the Taco Bell conversation and did not go to lunch with him again. Torres began taunting Davis with statements such as, "I'm watching you." and "Good girl. You haven't told anybody." He called her voice mail and left notes on her car, and the taunting lasted for approximately six months.

Davis was afraid to go to the police and did not tell anyone about what Torres had said. Then in June 1999, Davis was contacted by the NCIS and interviewed in a hotel room. Davis told NCIS Agents Warshawsky and Cheryl Craycraft about Torres's statements at the Taco Bell. Agent Warshawsky described Davis as "terrified" and "emotional" as she recounted Torres's statements.

## IV.

At trial, the State introduced evidence that the Honolulu Police Department had conducted local and national searches of criminal justice information databases and had found no entry for Ruben Gallegos. The State also introduced evidence that no passport was issued in Gallegos's name from 1992 to March 2006, when a passport records search was conducted.

## DISCUSSION

I. Torres's Incriminating Statements Were Properly Admitted, and There Was Sufficient Evidence to Support His Conviction.

Torres asserts that this case raises an issue of first impression in Hawai'i regarding the proof required to establish the corpus delicti for second-degree murder where a body has never been found. He claims that "[t]he prosecution failed to establish the corpus delicti for murder or show that Susan Davis's testimony was corroborated by substantial independent evidence." In particular, Torres argues that his incriminating statements to Davis were inadmissible because the State did not introduce sufficient independent evidence of the trustworthiness of the statements. He also argues that absent Davis's testimony, there was insufficient evidence to prove Gallegos was dead, an essential element of the murder charge, since Gallegos's body has never been recovered. We disagree with Torres's claims that his incriminating statements were improperly

---

5. The transcript of Davis's testimony reads as follows:

> A. .... And I says what happened then, he goes don't worry about it. I took care of it. (Gesture made).
> Q. So can you put your hand up again.
> A. He went—(gesture made).
> Q. You have your thumb and your pointy finger out—
> A. Like a gun.
> Q. —yeah, like a gun, in the shape of a gun?
> A. In the shape of a gun.
> Q. And you made a clicking noise?
> A. You know how you do a wink or whatever, that's what he did, he went don't worry about it, I took care of it like that. (Noise made and gesture). And when he did that I was terrified.
> Q. Did he make that sound that you just made?
> A. Yes.
> Q. Okay.
> A. With a wink.

admitted and that there was insufficient evidence to support his conviction.

## A.

Courts have used the term "corpus delicti" in defining certain elements of a crime and have also referred to the "corpus delicti rule," which is a common-law doctrine concerning the prerequisites for the admission and consideration of a defendant's confession to a crime.

In *State v. Hale*, 45 Haw. 269, 367 P.2d 81 (1961), the Hawai'i Supreme Court stated:

> Proof of the commission of a crime consists of three elements, each of which must be proved beyond a reasonable doubt: (1) the basic injury, such as the death in murder ..., (2) the fact that the basic injury was the result of a criminal, rather than a natural or accidental cause, and (3) the identification of the defendant as the perpetrator of the crime. The first two of these elements constitute the corpus delicti or body of the crime, which is proved when the prosecution has shown that a crime has been committed by someone.

*Id.* at 277 n. 1, 367 P.2d at 86 n. 1. Thus, to establish the corpus delicti, "the government need only prove that a crime has been committed[,]" and not that the defendant was the perpetrator. *Virgin Islands v. Harris*, 938 F.2d 401, 408 (3d Cir.1991). For murder, the corpus delicti requires proof that 1) the victim is dead and 2) the victim's death was caused by a criminal agency. *See* HRS § 707–701.5 (1993); *People v. Bolinski*, 260 Cal.App.2d 705, 67 Cal.Rptr. 347, 353 (1968).

In addition to using the term corpus delicti in defining the body or elements of a crime, courts also refer to the corpus delicti rule. *State v. Mauchley*, 67 P.3d 477, 482 (Utah 2003). Under the traditional formulation of the corpus delicti rule, the prosecution must introduce evidence that a crime has been committed (the corpus delicti), independent of the defendant's confession, before the confession can be admitted and used to establish the defendant's guilt. *Id.* at 482 & n. 2; *see Harris*, 938 F.2d at 409.

In 1954, the United States Supreme Court announced a new approach to the corpus delicti rule in two cases, *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954), and *Smith v. United States*, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954). *Opper* and *Smith* adopted the trustworthiness doctrine for determining whether a defendant's statements could be used to prove the defendant's guilt. Under the Supreme Court's version of the trustworthiness doctrine, a defendant's confession or statement may be used to prove the defendant's guilt as long as the prosecution introduces "substantial independent evidence which would tend to establish the trustworthiness of the statement." *Opper*, 348 U.S. at 93, 75 S.Ct. 158. In addition, "it is sufficient if the corroboration merely fortifies the truth of the confession, without independently establishing the crime charged[.]" *Smith*, 348 U.S. at 156, 75 S.Ct. 194.

In *State v. Yoshida*, 44 Haw. 352, 356–58, 354 P.2d 986, 989–90 (1960), the Hawai'i Supreme Court rejected the "rigid," traditional rule, which precluded consideration of a defendant's confession unless the essential elements of the corpus delicti were established by independent proof. Instead, the court adopted a more flexible rule embodied in the trustworthiness doctrine:

> [W]e find sound the reasoning of and align with the authorities which support the rule that does not require full proof of the corpus delicti to be established independently of the confession before it may be resorted to and that permits a confession to be relied on to meet and remedy a deficiency otherwise existing in the proof of the corpus delicti if the trustworthiness of the confession appears to be assured by circumstances shown by the independent evidence.

*Id.* at 357, 354 P.2d at 990.

The *Yoshida* court cited *Opper*, *Smith*, and *Wynkoop v. United States*, 22 F.2d 799 (9th Cir.1927), as among the authorities that Hawai'i was aligning with in adopting the trustworthiness doctrine. *Yoshida*, 44 Haw. at 358–60, 354 P.2d at 990–91. The *Yoshida* court quoted the following passage from *Opper*:

[W]e think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the *corpus delicti.* It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense. It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth. Those facts plus the other evidence besides the admission must, of course, be sufficient to find guilt beyond a reasonable doubt.

*Id.* at 359, 354 P.2d at 991 (citation omitted) (quoting *Opper,* 348 U.S. at 93, 75 S.Ct. 158).

The *Yoshida* court also noted that in *Smith,* the United States Supreme Court "answered in the affirmative the question 'whether it is sufficient if the corroboration merely fortifies the truth of the confession, without independently establishing the crime charged[.]'" *Id.* at 360, 354 P.2d at 991 (*quoting Smith,* 348 U.S. at 156, 75 S.Ct. 194).

### B.

Torres contends that the circuit court erred in admitting Davis's testimony regarding Torres's incriminating statements because the State failed to produce substantial independent evidence to corroborate Torres's statements. We disagree.

■ We conclude that the State sufficiently corroborated Torres's incriminating statements to warrant their admission. The State introduced substantial independent evidence which tended to establish the trustworthiness of Torres's statements. This independent evidence corroborated the essential facts contained in Torres's statements sufficiently to justify an inference of their truth.

The independent evidence corroborating the essential facts set forth in Torres's statements to Davis was as follows:

1. Torres's statement that he robbed a bank in Hawai'i was corroborated by evidence that Torres improperly wore his uniform while off-duty; Torres escorted Gallegos away from the cashier's cage; and Torres was later found with approximately $78,000 of the 80,000 that had been distributed to Gallegos earlier that morning.

2. Torres's statement that one of Torres's buddies who participated in the robbery "did not come back" was corroborated by evidence that Torres was the last person seen with Gallegos on May 1, 1992, and that Gallegos had not contacted or been seen by members of his close-knit family since that date.

3. Torres's statement that he "took care of" his buddy made in conjunction with a hand gesture simulating a gun and an apparent clicking sound was corroborated by evidence that: a) Gallegos disappeared after having last been seen with Torres on May 1, 1992; b) the condition of Gallegos's room indicated Gallegos planned to return; c) Gallegos's wallet and identification were found in Torres's car along with approximately $78,000 in cash; and d) a handgun containing spent cartridge casings for three bullets was found in Torres's car on the day Gallegos disappeared.

4. Torres's statement that he put his buddy "out of commission" by paralyzing him was corroborated by the discovery in Torres's car of a stun gun capable of rendering a person immobile or unconscious.

5. Torres's statement that he was stopped by a guard when he attempted to return to the military base to recover his belongings was corroborated by evidence that Torres was detained while attempting to enter PHNB and that Torres's personal belongings were found in his locker on PHNB after his arrest.

Additional support for the trustworthiness of Torres's statements to Davis can be found in the circumstances surrounding his making of those statements. Torres had developed a friendship and relationship of trust with Davis over a span of years that made him comfortable confiding personal information to Davis. Torres repeatedly told Davis that he was bothered and "felt really bad" about something he had done, which was "eating at

him." Eventually, Torres arranged to have lunch alone with Davis, instead of with a group of co-workers as usual, and confided to Davis that he had killed someone in connection with a robbery. The evidence thus showed that Torres chose to volunteer the incriminating statements to Davis, a friend and person he trusted, in order to divulge information over which he had a guilty conscience.

The foregoing corroborating evidence regarding Torres's incriminating statements "supports the essential facts admitted sufficiently to justify a jury inference of their truth[,]" *Yoshida*, 44 Haw. at 359, 354 P.2d at 991 (quoting *Opper*, 348 U.S. at 93, 75 S.Ct. 158), and served to "fortif[y] the truth" of Torres's confession. *Id.* at 360, 354 P.2d at 991 (quoting *Smith*, 348 U.S. at 156, 75 S.Ct. 194). The State introduced "substantial independent evidence which would tend to establish the trustworthiness of [Torres's] statement[s]." *Id.* (quoting *Opper*, 348 U.S. at 93, 75 S.Ct. 158). Accordingly, the circuit court did not err in admitting Torres's incriminating statements pursuant to the trustworthiness doctrine, and the jury was properly permitted to consider those statements.

## C.

■ Torres argues that the circuit court erred in denying his motions for judgment of acquittal because there was insufficient evidence to support his conviction.[6] We disagree.

At the outset we address the question of whether a dead body must be recovered for the State to establish sufficient evidence to support a murder conviction. Torres argues that the question of whether the State can establish the corpus delicti for second-degree murder without the recovery of a body is one of first impression in this jurisdiction. He notes that the Hawai'i statutes are "silent" on this issue, but acknowledges that other jurisdictions that have considered it have allowed the corpus delicti for murder to be established by circumstantial evidence.

---

6. Torres moved for judgment of acquittal at the close of the government's case-in-chief and after the close of all the evidence. Torres waived his right to challenge the denial of his motion for judgment of acquittal after the government's case-in-chief by presenting evidence in the de-

■ We hold that the recovery of a dead body is not a necessary condition for establishing murder. In so holding, we join numerous other jurisdictions that have not required the production of a dead body as a precondition for the prosecution to prove murder. *E.g.*, *Harris*, 938 F.2d at 411–15 & nn.12–14 (discussing cases from numerous states that have held that "the body of a missing person need not be produced to convict for murder"); *Hurley v. State*, 60 Md. App. 539, 483 A.2d 1298, 1304–05 (1984) (stating that "failure to recover the victim's body is not fatal to the State's case in a homicide prosecution"); *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236, 1242–43 (1988) (holding that "in the absence of a human body, a confession, or other direct evidence of death, circumstantial evidence alone may be sufficient to support a conviction for murder").

■ Circumstantial evidence is competent evidence and can be used to prove facts necessary to establish the commission of a crime. *See State v. Murphy*, 59 Haw. 1, 19, 575 P.2d 448, 460 (1978) ("[I]t is elementary that a criminal case may be proven beyond a reasonable doubt on the basis of reasonable inferences drawn from circumstantial evidence."); *State v. Elderts*, 62 Haw. 495, 500, 617 P.2d 89, 93 (1980). We see no reason why a different rule should apply in a murder case with respect to the State's obligation to prove that the defendant "cause[d] the death of another person." HRS § 707–701.5. "Surely, the successful concealment or destruction of the victim's body should not preclude prosecution of his or her killer where proof of guilt can be established beyond a reasonable doubt." *State v. Zarinsky*, 143 N.J.Super. 35, 362 A.2d 611, 621 (App.Div. 1976).

Torres's claim that the evidence was insufficient is premised on his contention that the circuit court erred in admitting Davis's testimony regarding Torres's incriminating statements. He argues that "without Davis's testimony, the prosecution failed to present

---

fense case. *State v. Mitsuda*, 86 Hawai'i 37, 38 n. 3, 947 P.2d 349, 350 n. 3 (1997); *State v. Kreps*, 4 Haw.App. 72, 75, 661 P.2d 711, 714 (1983). We thus only consider the motion made by Torres at the close of all the evidence.

substantial evidence to show that the basic injury occurred." Thus, our conclusion that Davis's testimony was properly admitted removes a critical assumption underlying Torres's claim.

Viewing Davis's testimony and the other evidence presented in the light most favorable to the State, we conclude that there was substantial evidence to support Torres's conviction. *See State v. Smith,* 106 Hawai'i 365, 372, 105 P.3d 242, 249 (App.2004) (stating standard of review for sufficiency-of-evidence claim). There was sufficient evidence that Gallegos was dead and that Torres had knowingly caused Gallegos's death, even though the State did not produce Gallegos's dead body.

The last time Gallegos was seen, he was being escorted by Torres from the SUBASE cashier's cage on May 1, 1992. Although Torres was not on duty that day, he was wearing his police uniform and carrying a handgun in contravention of the rules applicable to PHNB police officers. Torres was apprehended approximately five hours later while driving his car. Most of the $80,000 in cash and the cash bag that had been assigned to Gallegos were found in Torres's car, along with Gallegos's wallet, his identification, and a hairbrush Gallegos always carried. Torres confessed to Davis that in connection with a robbery in Hawai'i, he had put one of his friends who attempted to back out of the robbery "out of commission" by paralyzing him. Torres said that he "took care of" this person while simulating a gun with his hand and apparently making a clicking sound, and he told Davis that the person "would never be able to come back and tell anyone." A stun gun capable of immobilizing an individual and a handgun with spent cartridge casings for three bullets were recovered from Torres's car.

The evidence further showed that Gallegos's disappearance was sudden and apparently unplanned and did not comport with his lifestyle and habits. Gallegos's sister testi-

fied that prior to his disappearance, Gallegos was a member of a close-knit family and had contacted his parents on a weekly basis. Gallegos's family, however, had not heard from Gallegos since May 1, 1992. A search of Gallegos's bedroom on the day of his disappearance revealed that he left money and other possessions behind, which indicated that he planned on returning. Gallegos's name had not appeared in any local or federal criminal databases and no record of a passport issued in his name had been found since that day.

Other courts have found that similar evidence was sufficient to support the defendant's murder conviction in cases where no body was produced. *See Gilchrist v. State,* 466 So.2d 988, 991 (Ala.Crim.App.1984) (concluding that corpus delicti for murder was proven where no body was found but defendant's confession was corroborated by evidence, including that the victim had been missing for five months, contrary to her habit of contacting her parents); *Hurley,* 483 A.2d at 1305–06 (citing evidence of victim's habits and her failure to contact family members and friends as circumstantial proof of her death, where no body was produced); *People v. Curro,* 161 A.D.2d 784, 785–86, 556 N.Y.S.2d 364 (N.Y.App.Div.1990) (concluding that there was sufficient evidence to convict defendant of murder based on his incriminating statements and evidence that the victim's disappearance was unplanned and that relatives had not seen or heard from her). We conclude that the State produced sufficient evidence to prove that Torres committed second-degree murder and that the circuit court did not err in denying Torres's motions for judgment of acquittal.[7]

## II. The Circuit Court Did Not Err in Denying Torres's Motion to Suppress Evidence Recovered From Torres's Car

Torres argues that the circuit court erred in denying his motion to suppress the evi-

---

7. We reject Torres's claim that the circuit court erred in denying his motion to dismiss the indictment for lack of evidence. In *State v. Montgomery,* 103 Hawai'i 373, 381, 82 P.3d 818, 826 (App.2004), we held that the defendant could not challenge, on appeal, the denial of his or her motion to dismiss the indictment for lack of

probable cause after a conviction. In support of our holding, we cited *In re Doe,* 102 Hawai'i 75, 78, 73 P.3d 29, 32 (2003), in which the Hawai'i Supreme Court stated that "absent unusual circumstances, any defects in a pretrial determination of probable cause are rendered moot, or are without any effective remedy, which is much the

dence seized from his car. The searches of Torres's car took place on a closed military base and were conducted by federal law enforcement officers. Torres notes that the threshold question that must be answered is whether federal law or Hawai'i law applies in determining the lawfulness of the searches of his car. Torres argues that Hawai'i law applies and that under Hawai'i law, the initial warrantless search of his car by Agent Rozkiewicz was unlawful and tainted the subsequent search. The State counters that federal law applies and that under federal law, the searches were lawful. The State alternatively argues that even if Hawai'i law applies, the searches of Torres's car and the seizure of the evidence were proper.

We conclude that federal law applies to the searches at issue in this case and that under federal law, the searches were lawful. We therefore do not address the State's alternative contention that the evidence was properly seized under Hawai'i law.

### A.

The evidence pertinent to our review of the circuit court's denial of Torres's motion to suppress the evidence seized from his car revealed the following: [8]

In the morning on May 1, 1992, the PHNB police learned of the theft of a large sum of money from the Navy Exchange. Officer Crail discovered that the SUBASE cashier's cage was empty, a short time after he had taken Gallegos to the cage. Chang advised Officer Crail that Torres, who was wearing his uniform even though he was off-duty, had escorted Gallegos from the SUBASE cashier's cage. Chang also advised Officer Crail that Torres had escorted Gallegos from the

cage about ten minutes after Officer Crail had dropped Gallegos off. An all points bulletin was issued by the PHNB police to arrest and detain Torres and Gallegos and to be on the lookout for specified cars, including Torres's Chevrolet Celebrity. Sergeant Rozkiewicz was informed of the theft concerning the SUBASE cashier's cage and that Torres and Gallegos had been identified as the persons involved.

Sergeant Rozkiewicz and PHNB Police Major Christiano briefed Officer Aguilar on the reported theft and the involvement of Torres and Gallegos. The briefing included information that Torres had left the SUBASE cashier's cage with Gallegos and that no one knew of their whereabouts. Officer Aguilar was also advised that Torres and Gallegos may be armed. Officer Aguilar was dispatched to stand guard at the Makalapa Gate.

PHNB is a closed military base that is enclosed by fences and to which entry is restricted. It is a place where nuclear submarines, ships, and other military transport vehicles are housed and high ranking military officers are stationed.

Prior to and on May 1, 1992, there was a sign posted in front of the Makalapa Gate entrance to PHNB that warned visitors that they were entering "U.S. NAVY PROPERTY" and that "AUTHORIZED PERSONNEL ONLY" were welcome. The sign further stated:

> AUTHORIZED ENTRY ONTO THIS INSTALLATION CONSTITUTES CONSENT TO SEARCH OF PERSONNEL AND THE PROPERTY UNDER THEIR CONTROL. INTERNAL SECURITY ACT OF 1950 SECTION 21; 50 U.S.C. 797

The sign was posted on a fence approximately fifty feet from the guard shack. A person

---

same thing, by a subsequent conviction." In this case, Torres's challenge to the denial of his motion to dismiss the indictment for lack of probable cause was rendered moot by his subsequent conviction after trial. In any event, Torres's claim that there was insufficient evidence to support the indictment, like his claim that there was insufficient evidence to support his conviction, was premised on a contention that we have already rejected, namely, that Davis's testimony regarding Torres's incriminating statements

should have been excluded under the trustworthiness doctrine.

8. "In reviewing the circuit court's denial of a motion to suppress evidence, we consider both the record of the hearing on the motion to suppress and the record of the trial." *State v. Dawson*, 120 Hawai'i 363, 365 n. 3, 205 P.3d 628, 639 n. 3 (App.2009) (citing *State v. Kong*, 77 Hawai'i 264, 266, 883 P.2d 686, 688 (App.1994)).

reading the sign would have already turned onto PHNB, but the guard at the guard shack would allow a person to turn around if he or she chose not to enter PHNB after reading the sign. Torres had worked at the Makalapa Gate prior to May 1, 1992, and was familiar with the sign.

On May 1, 1992, at about 2:10 p.m., Officer Aguilar saw Torres in a line of cars, thirteen cars away, approaching the Makalapa Gate. Officer Aguilar knew Torres because they had attended the Pearl Harbor Police Academy together. Officer Aguilar told his partner, Officer Joye, to alert other PHNB police officers of Torres's arrival. Torres was driving his Chevrolet Celebrity and was dressed in civilian clothes. Officer Aguilar waived Torres through and then motioned Torres to stop after Torres passed him. Torres drove a little further and then stopped.

Torres rolled down his window and shook Officer Aguilar's hand. Officer Aguilar reached into the car, turned off the ignition, and grabbed the shifting lever, which was in park. Torres said, "[W]hat the fuck are you doing, Aguilar[?]" Officer Aguilar told Torres that the NCIS wanted to question him about the incident at SUBASE. Torres continued to struggle to restart the car and attempted to push Officer Aguilar's hand away from the shifting lever. At one point, Torres was able to start the car, but he was unable to move it because Officer Aguilar held the shifter in park. Eventually, Torres complied with Officer Aguilar's order that Torres step out of the car and lie face-down on the ground.

Sergeant Rozkiewicz was notified of Torres's apprehension at about 2:30 p.m. and proceeded to the Makalapa Gate. Torres was outside his car and in handcuffs. Sergeant Rozkiewicz instructed PHNB police officers to transport Torres to the PHNB police station. Sergeant Rozkiewicz then moved Torres's car to the nearby parking lot because the car was blocking traffic.

Pursuant to PHNB police procedures, PHNB police officers are to secure vehicles left unattended on PHNB and inspect the vehicle for hazardous materials. Such inspections are to ensure that the vehicle does not contain materials that could jeopardize the safety of the base. As a PHNB police officer, Torres would have been familiar with the rules and regulations regarding consent to search and searching vehicles that come onto PHNB.

Sergeant Rozkiewicz inspected the interior of Torres's car and opened the trunk. In the trunk, Sergeant Rozkiewicz saw a PHNB police uniform and a section of brown leather exposed in the opening of a plastic bag. As part of his inspection, Sergeant Rozkiewicz did not plan to look in the glove compartment. However, in attempting to secure the glove compartment by locking it, Sergeant Rozkiewicz inadvertently caused the lid to fall open. Sergeant Rozkiewicz saw a scanner and a pistol in plain view in the glove compartment. He then closed and locked the glove compartment and also locked the car after exiting it. Sergeant Rozkiewicz did not remove anything from the car. It was his understanding that NCIS would take over the investigation and obtain a warrant to search the car.

NCIS Special Agent Ty Torco (Agent Torco) prepared an affidavit in support of a Command Authorization for Search and Seizure (Command Authorization), seeking authorization to search Torres's car. Agent Torco's affidavit detailed the information he learned about Torres's involvement in the theft of $80,000 from the Navy Exchange and included the observations made by Sergeant Rozkiewicz during his inspection and securing of Torres's car. The Command Authorization was signed by W.A. Earner, Commander of PHNB. Federal agents from the NCIS and the FBI then searched Torres's car beginning at 7:46 p.m. The agents recovered incriminating evidence, including a brown bag containing $77,971.82 in cash, a revolver, a stun gun, a scanner, and Gallegos's wallet, identification, and personal effects.

### B.

The circuit court denied Torres's motion to suppress the evidence recovered from his car. The circuit court concluded that: 1) Torres consented to the search of his person and property by his conduct of driving onto

PHNB, which was a closed military base; 2) Sergeant Rozkiewicz's inadvertent opening of the glove compartment while following PHNB police procedures to secure the vehicle was not a search in the constitutional sense; 3) "because the investigating officers had sufficient probable cause to obtain a search warrant [for Torres's car] at the time [Torres] entered the Makalapa Gate of the Pearl Harbor Naval Base, the investigating officers would have inevitably obtained a 'Command Authorization for Search and Seizure'"; 4) the Command Authorization obtained in this case complies with the Hawaiʻi requirements for a search warrant; and 5) even excluding Sergeant Rozkiewicz's observations, the affidavit presented in support of the Command Authorization contained sufficient probable cause to warrant its issuance.

### C.

### 1.

■ We first address the choice-of-law question, namely, whether federal law or Hawaiʻi law governs in determining the lawfulness of the searches of Torres's car. Torres's car was searched after he entered a closed military base. The searches were conducted by federal law enforcement officers who were involved in a federal investigation into the theft of federal property committed on a military base by federal employees. There is no indication that any Hawaiʻi state law enforcement officer was involved in the searches of Torres's car. Under the particular circumstances of this case, we conclude that federal law applies in determining whether the evidence from Torres's car was lawfully seized.

The choice-of-law issue frequently arises when a search is conducted in one state but prosecution is pursued in another. The Hawaiʻi Supreme Court addressed this situation in *State v. Bridges,* 83 Hawaiʻi 187, 925 P.2d 357 (1996), and announced principles that guide our choice-of-law analysis in this case.

In *Bridges,* the Hawaiʻi Supreme Court addressed under what circumstances evidence obtained in another state (situs state) must be suppressed in a criminal prosecution in Hawaiʻi (forum state). Two Honolulu Police Department (HPD) officers traveled to California and there obtained evidence regarding a drug transaction through surreptitious audio/videotaping that apparently complied with California law. The State later sought to use this evidence in a prosecution brought in Hawaiʻi.

■ The Hawaiʻi Supreme Court noted that the issue of whether the law of the situs state or forum state should apply in this situation had been analyzed in two different ways: a conflicts of law analysis and an exclusionary rule analysis. *Id.* at 194–95, 925 P.2d at 364–65. The Hawaiʻi Supreme Court adopted the exclusionary rule analysis as the better approach. *Id.* at 195, 925 P.2d at 365. "[U]nder [the] exclusionary rule analysis[,] the court first identifies the principles to be served by the exclusionary rule, and then evaluates how the principles would be served by exclusion." *Id.* (quotation marks and citation omitted).

The supreme court identified three purposes underlying the exclusionary rule in Hawaiʻi: judicial integrity, individual privacy, and deterrence. *Id.* It stated that the exclusionary rule analysis involves determining "whether application of the exclusionary rule ... would sufficiently advance these purposes so as to justify the suppression of the reliable, probative evidence that was obtained...." *Id.* at 195–96, 925 P.2d at 365–66 (footnote omitted). The supreme court held that none of the purposes underlying the exclusionary rule justified the exclusion of the evidence procured in California by the Hawaiʻi police officers and that the trial court had erred in suppressing the evidence. *Id.* at 202, 925 P.2d at 372.

■ The supreme court explained that "[t]he 'judicial integrity' purpose of the exclusionary rule is essentially that the courts should not place their imprimatur on evidence that was illegally obtained by allowing it to be admitted into evidence in a criminal prosecution." *Id.* at 196, 925 P.2d at 366. As a general rule, the question of whether evidence was illegally obtained is answered by looking to the laws of the jurisdiction in which the evidence was obtained, in other words, the situs state. *Id.* The laws of the

forum state (Hawai'i) should not be considered unless there is some Hawai'i law that limits the powers of state officials even when they act extraterritorially. *Id.* at 196–97, 925 P.2d at 366–67. The supreme court held that "because the evidence at issue was apparently obtained in compliance with California law and because no relevant Hawai'i law applies extraterritorially to the conduct of its agents," judicial integrity would not be tarnished by the admission of the evidence. *Id.* at 197, 925 P.2d at 367.

The supreme court interpreted the "individual privacy" purpose as being tied to an individual's reasonable expectation of privacy, which it concluded would be based on the laws of the jurisdiction where the evidence was obtained. *Id.* at 198–99, 925 P.2d at 368–69. The court ruled that a person challenging the legality of the government's actions in obtaining evidence "would generally expect to look to the laws of the jurisdiction where the [evidence was obtained] to protect his or her privacy rights[.]" *Id.* at 199, 925 P.2d at 369 (quoting *United States v. Gerena,* 667 F.Supp. 911, 917 (D.Conn.1987)). Because the evidence at issue in *Bridges* was obtained in California in apparent compliance with California law, the court held that admitting the evidence "would not offend the individual privacy rationale of our exclusionary rule." *Id.* at 199, 925 P.2d at 369.

The supreme court also concluded that the deterrence rationale of the Hawai'i exclusionary rule would not justify suppression of the evidence. The deterrence rationale is founded on our expectation that the suppression of evidence based on particular police conduct in one case will cause the police to refrain from that type of conduct in the future. *Id.* The supreme court noted that "[m]ost authorities recognize that suppression of evidence in the forum state will have little, if any, deterrent effect on agents of the situs state conducting investigations within the situs state." *Id.* This is particularly true "when the manner in which the evidence was obtained did not violate situs law. . . ." *Id.* In this situation, practical considerations far outweigh any minimal deterrence that could be expected because it would be unreasonable to require police officers to know the rules of all fifty states, and because officers from the situs state may not be aware at the time of the investigation that the evidence will be used in another jurisdiction. *Id.* at 200, 925 P.2d at 370.

The supreme court held that even when forum state (Hawai'i) police officers participate in the obtaining of the evidence in the situs state, the deterrence rationale is ordinarily satisfied as long as the Hawai'i officers act in concert with situs police and comply with the situs state law. If the Hawai'i police officers act in this manner, "there will ordinarily be no need to 'deter' them." *Id.* at 202, 925 P.2d at 372. Because the Hawai'i officers coordinated their efforts with California law enforcement officers and apparently conducted their activities in compliance with California law, the supreme court held that the deterrence rationale did not support suppression of the evidence. *Id.*

### 2.

The searches of Torres's car were conducted by federal law enforcement officers on PHNB, a closed military base that is enclosed by fences and is within the special maritime and territorial jurisdiction of the United States. *See United States v. Kaneakua,* 105 F.3d 463, 465–66 (9th Cir.1997) (charging offenses committed on PHNB under the Assimilative Crimes Act, 18 U.S.C. § 13). Visitors to PHNB are warned that they are entering "U.S. NAVY PROPERTY." PHNB is subject to the control of a military commander who has the authority to restrict entry onto the base, *see* 32 C.F.R. §§ 770.28–31 (2008); *see also United States v. Jenkins,* 986 F.2d 76, 79 (4th Cir.1993), and PHNB has its own federal police force. As such, PHNB is akin to a separate jurisdiction or a situs state for purposes of the *Bridges* analysis, and the *Bridges* rationale for applying the law of the situs state supports the application of federal law in this case.

Application of federal law in determining whether the evidence obtained from Torres's car should be suppressed is consistent with the *Bridges* exclusionary-rule analysis. The judicial integrity of the Hawai'i courts would not be compromised by applying federal law.

No Hawai'i law enforcement officer was involved in the searches of Torres's car. The searches were conducted on a federal military base by federal officers whose activities were governed by federal law. As long as the evidence was obtained by the federal officers in compliance with federal law, Hawai'i courts would not be placing their imprimatur on evidence that was illegally obtained by allowing the evidence to be admitted.

The application of federal law is consistent with the "individual privacy" purpose of Hawai'i's exclusionary rule. The reasonable expectation of privacy of a person depends on where the evidence was obtained, since a person is generally expected to look for protection to the laws of the jurisdiction where the seizure of evidence occurred. Here, the evidence was seized on a closed military base, which was within the jurisdiction of the United States and subject to the control of a military commander, where a person would reasonably expect that federal law would be applicable.

Finally, the deterrent purpose of Hawai'i's exclusionary rule argues strongly in favor of applying federal law. Because no Hawai'i law enforcement officer was involved in the searches of Torres's car, there is no possible misconduct by Hawai'i law enforcement officers to deter. With respect to the federal officers, at the time Torres's car was searched by the federal officers, Torres was a suspect in an investigation of theft of federal property committed on a military base by federal employees. At that time, there was no indication that any evidence obtained as a result of the searches of Torres's car would later be used in a state prosecution. Thus, the federal officers had no reason to be concerned about, or attempt to conform their conduct to, Hawai'i law. Applying Hawai'i law to suppress the results of the searches would have little, if any, deterrent effect on the federal officers.

In analogous situations, other courts have concluded that federal law applies in determining whether evidence seized by federal officers is subject to suppression when offered in a state prosecution. *See In Matter of Teddington,* 116 Wash.2d 761, 808 P.2d 156, 161–63 (1991) (holding, in a case involving the seizure of evidence on a military base, that "[e]vidence which is lawfully obtained by federal officers pursuant to federal law is admissible in Washington State criminal proceedings even if seizure of evidence in a similar manner by state officials might violate the State of Washington Constitution"); *State v. Mollica,* 114 N.J. 329, 554 A.2d 1315, 1328–29 (1989) (concluding that evidence lawfully obtained by federal officers pursuant to federal law, the seizure of which would have violated state constitutional standards, may be used in a state prosecution provided "the federal action deemed lawful under federal standards not be alloyed by any state action or responsibility").

3.

Torres notes that in *Bridges,* the supreme court left open the issue of how the choice-of-law question would be decided where federal officers obtain evidence in Hawai'i that later was sought to be used in a state prosecution. In its discussion of the "individual privacy" purpose of Hawaii's exclusionary rule, the supreme court concluded that ordinarily a defendant would be expected to look to the laws of the jurisdiction where the evidence was obtained to protect his or her privacy rights. In a footnote to this discussion, footnote 15, the court stated:

> Under this interpretation of the individual privacy rationale of our exclusionary rule, one could argue that evidence obtained in Hawai'i by federal officers in compliance with federal law (and therefore not illegally obtained) but in violation of some more restrictive aspect of Hawai'i law should be suppressed in criminal prosecutions in Hawai'i state courts. *See State v. Rodriguez,* 110 Or.App. 544, 823 P.2d 1026, 1029–30 (1992), *rev'd on other grounds,* 317 Or. 27, 854 P.2d 399, 403–04 (1993); *cf.* [T.] Quigley, [*Do Silver Platters Have a Place in State–Federal Relations? Using Illegally Obtained Evidence in Criminal Prosecutions,* 20 Ariz. St. L.J. 285,] 325 [ (1988) ] ("In the case of evidence illegally seized by federal officers that is admissible in federal court because of an exception to the federal exclusionary rule, states should exclude the evidence consis-

tent with their own exclusionary rule.") . *In the instant case, however, we need not, and do not, decide that issue.*

*Bridges,* 83 Hawai'i at 199 n. 15, 925 P.2d at 369 n. 15 (emphasis added).

Obviously, the supreme court did not decide the issue raised in footnote 15 and thus did not preclude our analysis in this case. Moreover, it is not clear that footnote 15 contemplated the situation presented here, where the activities of the federal officers took place on a closed military base that was subject to the control of a military commander and was within the special maritime and territorial jurisdiction of the United States. We need not decide whether evidence obtained in Hawai'i by federal officers in compliance with federal law will always be admissible in a state prosecution. Instead, we narrowly hold that under the circumstances presented in this case, federal law applies in determining whether the evidence obtained by the federal officers pursuant to the searches of Torres's car on PHNB, a closed military base, was admissible in Torres's state prosecution.

### D.

#### 1.

We now turn to the question of whether the searches of Torres's car on PHNB were permissible under federal law. The circuit court concluded that "the investigating officers had sufficient probable cause to obtain a search warrant [for Torres's car] at the time [Torres] entered the Makalapa Gate of the Pearl Harbor Naval Base[.]" The circuit court issued this conclusion in connection with its determination that the federal officers would have inevitably discovered the incriminating evidence in Torres's car, because even absent Sergeant Rozkiewicz's observations, the officers would have obtained a Command Authorization to search Torres's car. However, the circuit court's conclusion that the investigating officers had probable cause to search Torres's car when he entered the Makalapa Gate, with which we agree, also establishes that the searches of Torres's car were valid under the federal automobile exception to the warrant requirement.

In his motion to suppress evidence filed in the circuit court, Torres addressed the federal automobile exception and disputed that the PHNB police officers had probable cause to search Torres's car when he entered the Makalapa Gate. Torres conceded, however, that if probable cause existed, the federal automobile exception authorized the search of the entire car:

> The defense position is weaker under Federal law. The defense contends that at most, reasonable suspicion, but not probable cause existed at the time of the search of the car. But if this court determines that probable cause existed, the entire car may have been searched under the "automobile exception" of *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 . . . (1982); *see Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 . . . (1925); *see also United States v. Vassiliou,* 820 F.2d 28 (2nd Cir.1987).

(Footnote omitted.)

#### 2.

Under the federal automobile exception to the warrant requirement, a warrantless search of an automobile is permitted as long as the police have probable cause to believe the automobile contains contraband or evidence of a crime. *United States v. Ross,* 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). The automobile exception is founded upon the ready mobility of automobiles, which frequently creates exigent circumstances that make obtaining a warrant impractical, and the diminished expectation of privacy that results from the use, characteristics, and regulation of automobiles. *Pennsylvania v. Labron,* 518 U.S. 938, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996); *California v. Carney,* 471 U.S. 386, 391–93, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). The scope of the warrantless search permitted under the automobile exception includes every part of the vehicle and any container within the vehicle in which the fruits or evidence of the crime may be found. *Ross,* 456 U.S. at 823–25, 102 S.Ct. 2157.

Although one of the rationales behind the automobile exception is the frequent presence of exigent circumstances due to the

mobility of automobiles, it is clear that the actual existence of exigent circumstances is not required. *Maryland v. Dyson,* 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) ("[U]nder our established precedent, the 'automobile exception' has no separate exigency requirement."). Thus, the automobile exception authorizes a warrantless search if there is probable cause to search the automobile.

■■■■ Based on the record in this case, we conclude that both Sergeant Rozkiewicz's initial search of Torres's car and the subsequent search by NCIS and FBI agents were supported by probable cause and thus were valid under the federal automobile exception to the warrant requirement. Under federal law, in determining whether the conduct of law enforcement officers complied with the Fourth Amendment, courts "look to the collective knowledge of all the officers involved in the criminal investigation...." *United States v. Sutton,* 794 F.2d 1415, 1426 (9th Cir.1986). This is true even if "all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually [undertakes the challenged action]." *Id.; see United States v. Bernard,* 623 F.2d 551, 561 (9th Cir.1980) (concluding that the knowledge of one officer is considered the knowledge of all the officers acting in close concert).

Here, the collective knowledge of the PHNB police officers who were involved in the investigation and apprehension of Torres established probable cause to search Torres's car at the time Sergeant Rozkiewicz inspected the car. When Torres was seen approaching the Makalapa Gate, the officers knew that Torres had been identified as a person involved in the theft of a large sum of money from the Navy Exchange. They knew that Torres had been seen earlier that morning leaving the SUBASE cashier's cage with Gallegos, that the money was missing, and that Torres (in violation of PHNB police rules) had been wearing his uniform even though he was off duty. Within about five hours of the reported theft, Torres was seen driving his car onto PHNB. Given the proximity in time and location to the reported theft, the large amount of money involved, and the other circumstances surrounding the reported theft, we conclude that there was probable cause to believe that the missing money or other evidence of the crime would be present in Torres's car when he entered the Makalapa Gate. *See United States v. George,* 883 F.2d 1407, 1417 (9th Cir.1989) (concluding that the police had probable cause to believe fruits of the crime would be found in the car of a robbery suspect, when the robberies were committed earlier that day and the car was still warm from being driven); *People v. Weston,* 114 Cal.App.3d 764, 170 Cal.Rptr. 856, 862 (1981) (concluding that police had probable cause to search the defendant's car for evidence of a robbery, where only four days had elapsed since the armed robbery in which defendant had participated); *State v. Greene,* 285 Or. 337, 591 P.2d 1362, 1364 (1979) (concluding that police had probable cause to search a car used in a theft/robbery, when the car was found the morning after the crime occurred); *State v. Smith,* 283 So.2d 470, 472 (La.1973) (concluding that police had probable cause to believe that evidence of an armed robbery would be found in cars linked to the robbers).

Torres's reaction to being stopped by Officer Aguilar provided additional probable cause to believe that Torres's car contained incriminating evidence. Torres struggled with Officer Aguilar and attempted to restart the car and drive away after Officer Aguilar turned off the ignition and grabbed the shifting lever. Torres continued in these actions after Officer Aguilar told Torres that NCIS wanted to speak to Torres about the SUBASE incident. Torres's attempt to flee supported a reasonable inference that he may have been concealing incriminating evidence in the car.

■■■■ Thus, prior to Sergeant Rozkiewicz's search, the PHNB police officers involved in the investigation collectively had probable cause to search Torres's car for fruits or evidence of the reported crime. Evidence of the reported crime, including the stolen money, could have been concealed in the glove compartment or the trunk. Accordingly, pursuant to the automobile exception, Sergeant Rozkiewicz was authorized to conduct a warrantless search of the entire car, includ-

ing the glove compartment and trunk, and his discovery of the gun and scanner in the glove compartment was lawful. Sergeant Rozkiewicz's subjective motivation for performing the search was irrelevant as long as his conduct was supported by probable cause. *See Whren v. United States,* 517 U.S. 806, 811–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (concluding that an officer's subjective motivations "play no role in ordinary, probable-cause Fourth Amendment analysis").

■ The existence of probable cause to search Torres's car prior to Sergeant Rozkiewicz's search also establishes that the subsequent search of the car by NCIS and FBI agents was lawful. A delayed warrantless search of a vehicle pursuant to the automobile exception is valid as long as an immediate search of the vehicle would have been permissible. *United States v. Johns,* 469 U.S. 478, 484, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) ("There is no requirement [under the automobile exception] that the warrantless search of a vehicle occur contemporaneously with its lawful seizure.") Accordingly, the full-scale search of Torres's car by NCIS and FBI agents was permissible pursuant to the automobile exception, and the evidence recovered from the car was lawfully seized. *See id.*

### 3.

■ We further conclude that Sergeant Rozkiewicz's security inspection of Torres's car was lawful based on Torres's implied consent and that the Command Authorization validly authorized the subsequent full-scale search by federal agents. Based on federal appellate court decisions involving searches in analogous circumstances on military bases, we hold that Torres implicitly consented to the search of his car, at least to the extent of the security inspection conducted by Sergeant Rozkiewicz.

In *Jenkins,* 986 F.2d 76, the Fourth Circuit held that a warrantless search of Norman Jenkins's car and his person on Andrews Air Force Base, a closed military base, was lawful even if the police lacked probable cause or particularized suspicion. The base was surrounded by a chain-link fence topped with barbed wire and patrolled by security

police and guard dogs. *Id.* at 77. Civilians were permitted to enter through perimeter gates that were monitored by security police. *Id.* A sign was posted at each gate, with the following warning:

> It is unlawful to enter this area without permission of the Installation Commander. *Sec. 21, Internal Security Act of 1960; 50 U.S.C. 797*
>
> While on this installation all personnel and the property under their control are subject to search.

*Id.*

Jenkins's wife, who worked at the hospital on the base, received a call from Jenkins in which he threatened to kill her. The wife called security and requested an escort. *Id.* As she left work, the wife spotted Jenkins sitting in his car. Jenkins drove away but was arrested at the gate. *Id.* The Andrews Air Force Base police recovered ammunition during the search of Jenkins's person, as well as a firearm, ammunition, and incriminating letters during the search of Jenkins's car. *Id.*

The Fourth Circuit reversed the trial court's suppression of the evidence obtained by the base police. The court stated that "[t]he case law makes clear that searches on closed military bases have long been exempt from the usual Fourth Amendment requirement of probable cause." *Id.* at 78. The court observed that military bases are closed "to protect a military installation that is vital to national security." *Id.* It noted that "[p]olice on a closed military base confront a host of security concerns not present in an ordinary civilian locale[,]" including that a base like Andrews Air Force Base "is an inviting target for terrorists, as well as for a hostile military strike, and a successful attack could seriously jeopardize the national welfare." *Id.* The court reasoned that the judiciary may weigh the extent to which the public or national interest is involved in determining whether the constitutional rights of individuals who seek and gain entrance to closed military installations have been invaded. *Id.*

In holding that the search of Jenkins's car and person was valid even absent probable cause or particularized suspicion that he had

committed a crime, the Fourth Circuit reasoned as follows:

> Jenkins had no right of unrestricted access to Andrews Air Force Base; he thus had no right to be free from searches while on the base. "A base commander may summarily exclude all civilians from the area of his command. It is within his authority, therefore, also to place restrictions on the right of access to a base." *Nor did the validity of Jenkins' search turn on whether he gave his express consent to search as a condition of entering the base. Consent is implied by the "totality of all the circumstances."* The barbed-wire fence, the security guards at the gate, the sign warning of the possibility of search, and a civilian's common-sense awareness of the nature of a military base—all these circumstances combine to puncture any reasonable expectations of privacy for a civilian who enters a closed military base.

*Id.* at 79 (emphasis added) (citations omitted).

In *Morgan v. United States*, 323 F.3d 776, 782 (9th Cir.2003), the Ninth Circuit held that a person may impliedly consent to a search on a military base. The Ninth Circuit stated: "Because [military] installations often warn of the possibility of search as a condition to entry, a warrantless search of a person seeking to enter a military base may be deemed reasonable based on the implied consent of the person searched." *Id.* at 778. The Ninth Circuit remanded the case because the factual record was insufficiently developed to determine whether Morgan had impliedly consented to the search of his vehicle. *Id.* at 778, 782.

Morgan, a civilian air traffic controller who worked on Edwards Air Force Base, was stopped by base security as he drove his car onto the base. *Id.* at 778–79. A base security officer asked Morgan if Morgan would consent to the search of his car. *Id.* Morgan refused, exited his vehicle, and was handcuffed. *Id.* Base security officers then searched Morgan's car and discovered an unloaded semi-automatic pistol. *Id.* Morgan sued, alleging that the suspicionless search of his vehicle violated his Fourth Amendment rights. *Id.* at 778.

In considering under what circumstances the search of Morgan's car would satisfy the requirements of the Fourth Amendment, the Ninth Circuit noted that "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Id.* at 780–81 (quotation marks and citation omitted). The court further noted that "[a] search not supported by probable cause may still be reasonable if the subject of the search consents to it. Such consent may be express or implied." *Id.* at 781 (citation omitted).

The Ninth Circuit cited the Fourth Circuit decision in *Jenkins* and the Fifth Circuit decision in *United States v. Ellis*, 547 F.2d 863 (5th Cir.1977),[9] as decisions that "have applied the implied consent exception to the probable cause requirement in the context of searches on military bases." *Id.* The Ninth Circuit then held:

---

9. In *Ellis*, the Fifth Circuit upheld the warrantless search of a civilian's car on a closed military base. Upon entering the base, the civilian, William Gaskamp, had obtained a pass which provided that "[a]accordance of this pass gives your consent to search this vehicle while entering, aboard, or leaving this station." *Ellis* 547 F.2d at 865 n. 1. The search of Gaskamp's car by a base investigator resulted in the recovery of marijuana which was used to prosecute Gaskamp. *Id.* at 865.

The Fifth Circuit upheld the search, concluding that by virtue of his actions in obtaining the visitor's pass, Gaskamp had validly consented to the search of his vehicle, leaving him with no reasonable expectation of privacy in his vehicle. *Id.* at 866. The court reasoned that because a base commander may summarily exclude all ci-

vilians from the base, the commander has the authority to place restrictions on the right of access to the base. *Id.* The court concluded that Gaskamp

> should have realized that his actions in presenting his vehicle to the guard at the entrance to [the base] with an implied request to drive aboard carried the possibility of an inspection then and there. The same need for preservation of military security gave governing authorities of the base every reasonable right to allow him to drive his car onto the [base] uninspected, but under terms of a visitor's pass which conditioned his entry and stay on the military reservation upon his consent to the search of his vehicle at anytime it was on [the base] premises.

*Id.*

We now join the Fourth and Fifth Circuits and hold that a person may impliedly consent to a search on a military base. As the Fourth Circuit noted, the "circumstances [of a military base] combine to puncture any reasonable expectations of privacy for a civilian who enters a closed military base." *Jenkins,* 986 F.2d at 79. *Id.* at 782 (brackets in original).

The Ninth Circuit noted that "[i]n dismissing Morgan's claim, the [trial] court [had] suggested that probable cause was not needed to search Morgan's car because the search occurred on a closed military base." *Id.* at 782. The Ninth Circuit concluded that "while the [trial] court was correct that probable cause may not be needed in this case," it went "too far in allowing a categorical exception to the probable cause rule for all searches on closed military bases[ ]" because "the probable cause requirement is only obviated if the [individual] impliedly consented to the search." *Id.* The Ninth Circuit remanded the case for further proceedings to determine whether Morgan had impliedly consented to the search because the existing record was insufficient to permit this determination. *Id.*

In this case, we conclude that Torres impliedly consented to Sergeant Rozkiewicz's security inspection of Torres's car when Torres entered PHNB through the Makalapa Gate on May 1, 1992. At that time, PHNB was a closed military base, and entry onto the base was restricted. There was a sign at the Makalapa Gate that warned people entering PHNB that "AUTHORIZED ENTRY ONTO THIS INSTALLATION CONSTITUTES CONSENT TO SEARCH OF PERSONNEL AND PROPERTY UNDER THEIR CONTROL." In addition, pursuant to PHNB police procedures, unattended cars were subject to inspection for hazardous materials to ensure the safety of the base. As a PHNB police officer, Torres would have been familiar with the sign and the PHNB police procedures.

■ On May 1, 1992, Torres chose to enter PHNB through the Makalapa Gate. By entering onto the base, Torres impliedly consented to a security inspection of his unattended car for hazardous materials, and he

was left with no reasonable expectation of privacy in his car with respect to such a security inspection. Explosives and other hazardous materials can be small and easily concealed, *see United States v. Pulido–Baquerizo,* 800 F.2d 899, 901 (9th Cir.1986), and therefore, an inspection for hazardous materials could reasonably encompass a car's glove compartment. Accordingly, Sergeant Rozkiewicz's security inspection of Torres's car and Sergeant Rozkiewicz's observation of the contents of Torres's glove compartment were lawful.

Moreover, even absent Torres's implied consent, Sergeant Rozkiewicz's security inspection of Torres's car was lawful. Sergeant Rozkiewicz, whom the circuit court found credible, testified that he inspected Torres's car pursuant to an established PHNB police procedure calling for a security inspection of unattended cars for hazardous materials. The purpose of these inspections was to ensure that unattended cars did not contain materials that could jeopardize the safety of the base. Given the special security concerns associated with a closed military base, the security inspection of Torres's car for hazardous materials was reasonable. *See United States v. Miles,* 480 F.2d 1217, 1219 (9th Cir.1973); *United States v. Green,* 293 F.3d 855, 859 (5th Cir.2002). The justification for searching the car for hazardous materials extended to the glove compartment which could potentially have contained such materials. Thus, it makes no difference that Sergeant Rozkiewicz opened the glove compartment by mistake since a check of the glove compartment fell within the scope of a permissible security inspection.

■ The subsequent full-scale search of Torres's car pursuant to the authority of the Command Authorization was valid. Torres's challenge to the validity of the Command Authorization search is founded on Hawai'i law. Torres contends that under Hawai'i law, a base commander does not have the authority to issue a search warrant. We have concluded, however, that federal law applies to the searches of Torres's car. The United States Court of Appeals for the Ninth Circuit has upheld a search warrant issued by a base

commander under circumstances similar to this case. *United States v. Banks*, 539 F.2d 14, 16–17 (9th Cir.1976); *see also United States v. Rogers*, 388 F.Supp. 298 (E.D.Va. 1975) (upholding search of civilian's apartment, car, and locker based on a Command Authorization for Search and Seizure issued by a military commander).

### E.

Torres argues that the circuit court, in ruling on Torres's motion to suppress, erred in failing to consider an interview statement made by Officer Joye. Officer Joye's interview statement was included in an NCIS report. Torres attempted to introduce Officer Joye's statement at the suppression hearing, claiming that Officer Joye was unavailable as a witness.

The following information was contained in Officer Joye's interview statement. Officer Joye was present when Sergeant Rozkiewicz moved and inspected Torres's car on May 1, 1992. According to Officer Joye, Sergeant Rozkiewicz exited Torres's vehicle and told Officer Joye to request the assistance of detectives. Sergeant Rozkiewicz went back into the car and then opened the trunk, spending 2–3 minutes looking inside. Sergeant Rozkiewicz closed the trunk, walked toward Officer Joye, and told Officer Joye to radio the PHNB police department and inform them that "the evidence is in the car." Officer Joye overheard Sergeant Rozkiewicz's radio conversation with the PHNB police department during which the person on the other end asked Sergeant Rozkiewicz, "Was it in plain view?" and then stated, "Go to channel seven."

█ The circuit court continued the suppression hearing without ruling on the admissibility of Officer Joye's statement and did not address the matter when the hearing resumed. We conclude that any error in the circuit court's failure to admit and consider Officer Joye's statement was harmless. Torres sought to introduce Officer Joye's statement in support of his argument that Sergeant Rozkiewicz's search of Torres's car was illegal because Sergeant Rozkiewicz had an investigatory motive to look for criminal evidence. However, the information in Officer Joye's statement, including Sergeant Rozkiewicz's purported declaration that "the evidence is in the car[,]" would not have refuted Sergeant Rozkiewicz's justification for his actions. Officer Joye's statement refers to Sergeant Rozkiewicz's reaction to what Sergeant Rozkiewicz saw in the car, not to why he searched in the first place.

Moreover, even if Sergeant Rozkiewicz had an investigative motive, such motive would not have served to invalidate the security inspection which was conducted pursuant to PHNB police procedures. *See United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir.1993) (noting that "[w]hen the police conduct would have been the same regardless of the officer's subjective state of mind, no purpose is served by attempting to tease out the officer's 'true' motivation"). In any event, we have concluded that Sergeant Rozkiewicz's search of Torres's car was valid based on the automobile exception and Torres's implied consent to a security-inspection search of unattended vehicles for hazardous materials. Officer Joye's statement would not have provided a basis for negating these grounds for Sergeant Rozkiewicz's search.

### III. The Circuit Court Did Not Err in Excluding a Letter from a Deputy Prosecuting Attorney and the Original Federal Complaint

Torres argues that the circuit court erred in precluding him from introducing: 1) a September 2003 letter from Deputy Prosecuting Attorney Kevin Takata (Takata) to Agent Warshawsky, in which Takata stated that the Honolulu Prosecutor's Office would take no further action on the case at that time "due to insufficient evidence to prove beyond a reasonable doubt that [Torres] murdered Ruben Gallegos on May 1, 1992"; and 2) the initial federal complaint, filed on May 1, 1992, which charged both Torres and Gallegos with the theft of approximately $80,000. Torres argues that these documents were relevant to the defense theory that Gallegos, along with Torres, was involved in the theft of funds from the Navy Exchange and that Gallegos went into hiding after Torres's arrest to avoid being prosecuted for theft. Torres further suggests that

the proffered evidence was relevant to impeach Agent Warshawsky's testimony that Gallegos was not considered a suspect in the theft.

 We reject Torres's claims. The question of the sufficiency of the evidence to convict Torres of murder was for the jury to decide at trial. The September 2003 letter from Takata, stating the position of the Honolulu Prosecutor's Office regarding its willingness to pursue a murder prosecution at that time, had no bearing on and was irrelevant to whether Torres, in fact, had murdered Gallegos.

 The initial federal complaint was filed on the same day that Torres was arrested, in the very early stages of the investigation. Ten days later, an amended federal complaint was filed which only named Torres as a defendant. The initial complaint was irrelevant because the federal government's first charging decision, made at the very early stages of the case, had no bearing on whether Torres had murdered Gallegos. To the extent that Torres wished to argue that Gallegos had a reason to go into hiding, he did not need to introduce the initial federal complaint to do so. It was undisputed that Gallegos had left the cashier's cage with roughly $80,000 in government funds. Thus, if Gallegos was alive, he had an obvious reason to go into hiding to avoid potential prosecution.

The evidence established that as the investigation developed, federal agents, including Agent Warshawsky, concluded that Torres was the only suspect in the theft. Agent Warshawsky was assigned to the investigation in September 1994. We fail to see how the initial federal complaint or Takata's letter could have served in a meaningful way to impeach Agent Warshawsky's testimony.

IV. Torres is Entitled to a New Trial Based on the Circuit Court's Error in Admitting Agent Robbins's Opinion Testimony Regarding the Time Frame in Which Torres's Gun Had Been Fired.

Torres argues that the circuit court erred in permitting Agent Robbins's opinion testi-

mony that the revolver recovered from Torres's car had been recently fired, "within the same day, probably eight hours or so" (hereinafter, the "time-frame testimony"). In the context of this case, Agent Robbins's opinion regarding the specific time frame in which the gun had been fired was particularly significant because it provided a direct link between the firing of the gun and Gallegos's murder. Gallegos had last been seen leaving the SUBASE cashier's cage with Torres at about 9:00 a.m., and Agent Robbins examined the gun at about 8:00 p.m. later that day. Therefore, for the gun to have been used by Torres to murder Gallegos, it must have been fired within about eleven hours of Agent Robbins's examination. If the gun had been fired outside this time frame, it could not have been used to murder Gallegos.

 A trial court's decision on whether to admit opinion testimony is subject to review for abuse of discretion. *State v. Toyomura*, 80 Hawai'i 8, 23–24, 904 P.2d 893, 908–09 (1995). "Generally, to constitute an abuse of discretion, it must appear that the trial court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* at 24, 904 P.2d at 909 (internal quotation marks, citation, and brackets omitted). For the reasons discussed below, we conclude that the circuit court abused its discretion in admitting Agent Robbins's time-frame testimony and that this error was not harmless beyond a reasonable doubt.

A.

Robbins testified that on May 1, 1992, he was a special agent in charge of the NCIS Office at Pearl Harbor and at that time had twenty-five years of experience as a criminal investigator with the NCIS and the United States Navy. Agent Robbins had a bachelor of science degree in criminalistics. During his career as a law enforcement officer, Agent Robbins had significant experience in the use and maintenance of firearms. Agent Robbins stated that he routinely carried a firearm throughout his career; was trained in the use, cleaning, and maintenance of the firearm; was required to qualify at the range

on a quarterly basis throughout his career; was familiar with how to clean a weapon and what a dirty weapon looked like; and had served as a "range officer" and a "coordinator of firearms training." Agent Robbins acknowledged, however, that he had never before testified as a firearms expert or rendered an opinion on whether a firearm had been recently fired; he did not have extensive training in the forensic arts; and he had not done laboratory work examining firearms or obtained special schooling in the analysis of firearms discharges.

Agent Robbins testified that during the search of Torres's car on May 1, 1992, he inspected the Smith and Wesson, five-shot revolver found in the glove compartment. He observed that there were five cartridges in the gun, four of which contained dented primer caps. The dented caps indicated that an attempt had been made to fire the bullet in those cartridges. Three of the cartridges with dented primer caps were empty, with no bullets. One of the cartridges with a dented primer cap still had a bullet, signifying that the gun had misfired. The one cartridge with the undented primer cap, which meant that no attempt had been made to fire it, had an intact bullet and was in position to be fired with the next trigger pull.

Agent Robbins opened the cylinder of the firearm and looked into the barrel. Based on his examination of the gun, Agent Robbins testified that he believed the gun "had been recently fired."[10] Agent Robbins explained the basis for this belief:

Q. And how could you tell that it had been recently fired, sir?

A. The primer residue which is characteristic or the powder residue which is characteristic of a fired revolver was evident on the—in the barrel. It was evident on the crane and the frame of the weapon.

It appeared to be moist whether [sic] than dried. My experience indicates that powder residue tends to dry out after a period of time. This powder was still moist.

Q. Does the powder residue does it change color with age?

A. Depends how long it's been in the weapon. I mean, it certainly does change color. It would change to more of a rust color and this was still fresh and black gray. But the primary characteristic again was the moistness of the powder.

The prosecutor asked Agent Robbins what he meant by "recently" when he gave his opinion that the gun had been recently fired. Agent Robbins responded, "I mean within the same day, probably about eight hours or so." Agent Robbins testified that he based this time-frame opinion on "[t]he moistness of the powder residue and the fact that the weapon had no indication of rust." He further testified that he noted that the gun had been well maintained, explaining that by well maintained he meant:

There was no evidence of rust on the weapon that might have been preexisting caused by factors other than powder residue. It appeared to be a functioning weapon. Of course, I'm no expert, I did not examine that. It appeared to be in relatively good condition.

On cross-examination, Agent Robbins testified that he examined the revolver between 7:00 and 8:00 in the evening. He testified that his opinion that the gun had been recently fired was based strictly on his personal experience handling firearms. He acknowledged that his opinion was not based on any scientific studies; that he had not personally done comparison studies on how long it takes for gunpowder residue to oxidize; that he was not aware of any test that

---

10. Prior to Agent Robbins's testimony that the gun had been recently fired, Torres objected, arguing that Agent Robbins did not qualify as an expert and that there was insufficient foundation to permit his testimony as a lay opinion. The circuit court overruled the objection at a bench conference stating: "I'm going to allow it. I'll let him give an opinion. To me, he's been shooting, maintaining, cleaning, involved with weapons and he's going to be only as good as his reasons. He may fall flat but that's my ruling."

After the bench conference concluded, the circuit court advised the jury as follows:

I'm going to allow Mr. Robbins [to] give an opinion, as to what the value the jury gets to decide. Just because somebody opines doesn't mean you have to accept it. And the basis of the opinion is qualification, it goes not to admissibility but as to weight. I haven't yet decided whether as a lay witness or as an expert witness....

could determine when the gun he examined, or a gun in general, was fired, stating that "Sir, I'm not an expert—I have no knowledge of a scientific test that would determine that"; and that he was not aware of anything that can tell you how old gunpowder residue is.

On redirect examination, Agent Robbins testified that in the twenty years that he used a revolver as his primary weapon, he had shot thousands of rounds of ammunition and had observed the gun after it had been fired. His opinion that the revolver recovered from Torres's car had been recently fired was based on this experience.

### B.

The circuit court did not specifically rule on whether it admitted Agent Robbins's time-frame testimony as lay opinion or expert testimony. It appears, however, that the circuit court admitted Agent Robbins's testimony as a lay opinion. The circuit court did not rule that Agent Robbins qualified as an expert with respect to the time-frame testimony. In addition, during the settlement of jury instructions, both parties indicated that Agent Robbins should be treated as a lay witness.

Ultimately, for purposes of our analysis, it does not matter whether Agent Robbins's time-frame testimony was admitted as lay opinion or expert testimony because we conclude that such testimony was not admissible on either basis. We conclude that the circuit court abused its discretion in admitting Agent Robbins's time-frame testimony because: 1) the State did not set forth a sufficient foundation for the admission of the time-frame testimony as a lay opinion; 2) Agent Robbins's opinion on the time frame in which Torres's gun had been fired required expert testimony; and 3) the State did not satisfy the foundational requirements for admission of the time-frame testimony as expert testimony.

### 1.

The admission of lay opinion testimony and expert witness testimony is governed, respectively, by Hawaii Rules of Evidence

(HRE) Rule 701 and Rule 702 (1993), which provide that:

**Rule 701. Opinion testimony by lay witnesses.** If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

**Rule 702. Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

Opinion testimony is admissible under HRE Rule 701, "[a]s long as (1) the witness has personal knowledge of matter that forms the basis of the testimony; (2) the testimony is rationally based on the witness' perception; and (3) the opinion is helpful to the jury (the principal test)...." *State v. Jenkins*, 93 Hawai'i 87, 105, 997 P.2d 13, 31 (2000) (internal quotation marks and citations omitted). "[HRE] Rule 701 'retains the common-law requirement that lay opinion be based upon firsthand knowledge.'" *State v. Nishi*, 9 Haw.App. 516, 521, 852 P.2d 476, 479 (1993) (brackets omitted) (quoting Commentary to HRE Rule 701). "The rational test means whether the opinion is one which a normal person would form on the basis of the observed facts." *Id.* (internal quotation marks and citation omitted). "[W]here relevancy requires, a foundation must be laid as to the witness' personal knowledge of facts to which the observed facts are being compared." *Id.* at 522, 852 P.2d at 479 (internal quotation marks and citation omitted). "For example, before an occurrence witness can testify that the car was going about 70 m.p.h., a foundation must be laid establishing the witness' personal knowledge of how fast

70 m.p.h. really is." *Id.* at 522 n. 7, 852 P.2d at 479 n. 7 (internal quotation marks, citation, and brackets omitted).

█ Under these standards, the State failed to set forth a sufficient foundation for the admission of Agent Robbins's time-frame testimony under HRE Rule 701. Agent Robbins's opinion that Torres's gun was fired within a specific time frame—"within the same day, probably eight hours or so"—was based on the moistness of the gunpowder residue and the absence of rust on the gun. Although the State presented evidence that Agent Robbins had experience handling firearms, it did not adduce evidence that Agent Robbins's time-frame testimony was rationally based on his perception or his personal knowledge. In particular, the State provided no foundation that Agent Robbins had personal knowledge of the moisture content or appearance of gunpowder residue in a revolver at various times after the gun had been fired. Agent Robbins did not testify that he had ever examined gun barrels at various intervals from the time of firing; he did not testify that he had personal knowledge of the period of time it would take for gunpowder residue to change from moist to dry; and he did not provide any other rational basis for believing that he was capable of determining a specific time frame within which Torres's gun had been fired. The State also did not provide any foundation that Agent Robbins had personal knowledge of how long it would take after a gun was fired for rust to develop.

To the contrary, Agent Robbins acknowledged that he had not personally conducted and was not aware of any test that could tell a person when a gun had been fired; he did not know how to determine the age of gunpowder residue or how long it took for gunpowder to oxidize; he had never before rendered an opinion on whether a firearm had been recently fired; and he had no laboratory experience or special schooling in the analysis of firearms discharges. Agent Robbins's testimony made it abundantly clear that the State had failed to lay a sufficient foundation to permit Agent Robbins to render a lay opinion that Torres's gun had been fired "within the same day, probably eight hours or so." [11]

### 2.

█ We further conclude that Agent Robbins's opinion on the time frame in which Torres's gun had been fired required expert testimony; his time-frame testimony did not fall within the permissible scope of lay opinion testimony. Although it is difficult to draw a distinct line between the permissible subjects for lay opinion testimony and expert testimony, Agent Robbins's time-frame testimony falls comfortably on the expert-testimony side of the line.

When enacted in 1980, HRE Rules 701 and 702 were modeled upon and were virtually identical to the corresponding Federal Rules of Evidence (FRE) Rules 701 and 702. *See* Commentary to HRE Rule 701 and HRE Rule 702.[12] In 2000, FRE Rule 701 was amended to specifically provide that lay opinions could "not [be] based on scientific, technical, or other specialized knowledge within

11. *See Toyomura*, 80 Hawai'i at 26, 904 P.2d at 911 (holding that an insufficient foundation was laid to permit a police officer to render a lay opinion that the defendant was intoxicated based upon the defendant's performance on field sobriety tests, where the prosecution elicited no evidence establishing that 1) the tests administered were elements of the police's field sobriety test protocol; 2) there was an authoritatively established relationship between a person's performance on the tests and the person's degree of intoxication; and 3) the police officer had received specific training in administering and grading the tests); *see also State v. McKee*, 91 Ohio St.3d 292, 744 N.E.2d 737, 742 (2001) (holding that there was insufficient foundation laid to support witnesses' lay opinion regarding the identification of a controlled substance, where the witnesses' testimony was "sketchy and conclusory"; one witness assumed the substance was marijuana "without explaining in detail how she arrived at this conclusion"; and there was "no evidence as to how many prior experiences the [witnesses] had had with the drug").

12. HRE Rule 701 has remained unchanged. HRE Rule 702 was amended in 1992 to add the last sentence of the current rule. 1992 Haw. Sess. L. Act 191 § 2, at 410. FRE Rule 702 was amended in 2000 by adding provisions in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). FRE Rule 702 advisory committee's note. This amendment to FRE 702 is not significant for purposes of our analysis in this case.

the scope of [FRE] Rule 702."[13] The Advisory Committee Notes to the 2000 amendment to FRE Rule 701 explain that the purpose of the amendment was to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." FRE Rule 701 advisory committee's note. The 2000 amendment to FRE Rule 701 also ensures that a party will not evade rules requiring pre-trial disclosure of expert witnesses by "simply calling an expert witness in the guise of a layperson." *Id.* The 2000 amendment to FRE 701 incorporates the distinction set forth in *State v. Brown*, 836 S.W.2d 530, 549 (Tenn.1992), that "lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.' " FRE Rule 701 advisory committee's note.

Although Hawai'i has not amended HRE Rule 701 to incorporate the 2000 amendment to FRE Rule 701, the Hawai'i Supreme Court has implicitly recognized the limitation on lay opinion testimony set forth in the 2000 amendment to FRE Rule 701.[14] In cases upholding the admission of opinion testimony as lay opinion, the supreme court justified its decisions by noting that the challenged testimony *did not require* "scientific, technical, or other specialized knowledge" within the scope of HRE Rule 702. *Jenkins*, 93 Hawai'i at 105, 997 P.2d at 31 ("Jenkins does not suggest, nor does the record reflect, that testimony regarding whether the pouches qualified as rigidly constructed containers or commercial gun cases required 'scientific, technical, or other specialized knowledge,' such that expert testimony would have been required pursuant to HRE Rule 702 (1993)."); *Yoneda v. Tom*, 110 Hawai'i 367,

385, 133 P.3d 796, 814 (2006) ("Yoneda's testimony as to the events leading up to the accident and his observations regarding the location of the restroom building and the route of the cart path did not require 'scientific, technical, or other specialized knowledge' such that expert testimony would have been required pursuant to HRE Rule 702[.]").

Here, Agent Robbins's opinion that Torres's gun was fired within a specific time frame was based on the moistness of the gunpowder residue and the absence of rust on the gun. The ability to discern a specific time frame for the gun's firing based on these observations would clearly require scientific, technical, or other specialized knowledge. A typical juror would not be able to translate the observation of gunpowder residue and the absence of rust into a computation of when a gun had last been fired. Certainly, Agent Robbins's opinion did not result from "a process of reasoning familiar in everyday life." *Brown*, 836 S.W.2d at 549. Rather, Agent Robbins's time-frame testimony involved matters outside the ken of a normal juror and required specialized knowledge to evaluate and understand. *See id.* at 549–50; *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex.Crim.App.2002) (requiring that a witness be qualified as an expert "when the factfinder may not fully understand the evidence or be able to determine the fact in issue without the assistance of someone with specialized knowledge"); *cf. State v. Batangan*, 71 Haw. 552, 556, 799 P.2d 48, 51 (1990).

HRE Rule 702 requires the trial court to evaluate proffered expert testimony for reliability and relevance before it can be admitted. *Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co.*, 100 Hawai'i 97, 117, 58 P.3d 608, 628 (2002) (citing *State v. Vliet*, 95 Hawai'i 94, 106, 19 P.3d 42, 54 (2001)). Agent Robbins's time-frame testi-

---

**13.** After the 2000 Amendments, which added clause (c), FRE Rule 701 reads as follows:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and *(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.*

(Emphasis added.)

**14.** Other courts have concluded that the 2000 amendment to FRE Rule 701 was not substantive in nature, but merely clarified the correct interpretation of the pre-amended version of FRE Rule 701, which was identical to HRE Rule 701. *Ragland v. State*, 385 Md. 706, 870 A.2d 609, 619 (2005); *United States v. Garcia*, 291 F.3d 127, 139 n. 8 (2d Cir.2002).

mony is the type of opinion testimony that HRE Rule 702 was designed to cover. The State did not cite, and we did not find, any reported decision permitting a witness to render an opinion on the specific time frame in which a gun had been fired based on the factors identified by Agent Robbins. The circuit court should have required the State to satisfy the requirements of HRE Rule 702 before admitting Agent Robbins's time-frame testimony.

3.

Based on the foregoing, we conclude that Agent Robbins's time-frame testimony was not admissible as lay opinion testimony. We further conclude that the State did not meet the foundational requirements for the admission of Agent Robbins's time-frame testimony as expert testimony under HRE Rule 702.

> The language of [HRE] [R]ule 702 establishes three conditions for the receipt of expert testimony: (1) that the witness be qualified "by knowledge, skill, experience, training, or education," (2) that the testimony have the capacity to "assist the trier of fact to understand the evidence or to determine a fact in issue," and (3) that the expert's analysis meet a threshold level of reliability and trustworthiness.

Bowman, *Hawaii Rules of Evidence Manual* § 702–1 (2008–09 ed.).

> The reliability requirement refers to *evidentiary* reliability—that is trustworthiness. Under this prong, admission of expert evidence is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his or her discipline. In this context, the trial court is assigned the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.

*Vliet*, 95 Hawai'i at 106, 19 P.3d at 54 (quotation marks, citations, brackets, and ellipsis points omitted).

The State failed to satisfy the threshold foundational requirement of showing that Agent Robbins qualified as an expert "by knowledge, skill, experience, training, or education" with respect to the time-frame testi-

mony. HRE Rule 702. Indeed, Agent Robbins readily acknowledged that he was not an expert in the field of firearms analysis or in how to determine the time frame in which a gun had been fired. He admitted that he had not performed laboratory work or received special schooling in the analysis of firearms discharges and that he had never before testified as a firearms expert or rendered an opinion on whether a firearm had been recently fired.

In addition, the State failed to adduce evidence demonstrating that Agent Robbins's time-frame testimony had "a reliable basis in the knowledge and experience of his or her discipline" and "rests on a reliable foundation." *Vliet*, 95 Hawai'i at 106, 19 P.3d at 54 (quotation marks, citations, and brackets omitted). Agent Robbins stated that he was not aware of any test that could determine the time frame in which a gun had been fired and did not know how to determine the age of gunpowder residue, even though his time-frame testimony was principally based on the moistness of the power residue. Agent Robbins further acknowledged that his time-frame testimony was not based on any scientific studies. We have not been cited any authority verifying that the observations made by Agent Robbins would provide a reliable basis for determining the time frame in which a gun had previously been fired. The State failed to satisfy the foundational requirements for the admission of Agent Robbins's time-frame testimony as expert testimony under HRE Rule 702.

C.

 Agent Robbins's time-frame testimony was inadmissible under HRE Rules 701 and 702, and the circuit court abused its discretion in admitting this testimony. We conclude that the circuit court's error was not harmless beyond a reasonable doubt.

The State presented Agent Robbins as a person with extensive experience in the use and maintenance of revolvers, the type of gun owned by Torres and recovered from Torres's car. The recovery of Torres's gun from his car and the condition of the gun, including the existence of spent and unspent

cartridges and gunpowder residue, were relevant to the State's theory that Torres had used the gun to murder Gallegos. The evidence regarding the time frame in which Torres's gun had been fired, however, was particularly significant. The gun could only have been used by Torres to commit the murder if it had been fired within eleven hours of when it was examined by Agent Robbins. Thus, Agent Robbins's time-frame testimony served to provide a direct and important link between Torres's gun and its use by Torres to murder Gallegos.

In closing argument, the State relied upon Agent Robbins's time-frame testimony to support its claim that Torres had murdered Gallegos. The prosecutor stated: "[A]nd you heard from the—the witness, Robert Robins [sic], the gun that was found in the defendant's car was fired that day, within the last eight hours." Anticipating the defense argument that the State had failed to adduce scientific evidence to prove that Torres had murdered Gallegos, the prosecutor said:

> The only science you need is this. There's three spent cartridges. There is one misfired round. *And this .38 caliber revolver that you know from the testimony was fired with the last hour-eight hours before they looked at it.* So that's the only evidence you need in this case.

(Emphasis added.)

The prosecutor also addressed the special interrogatory which asked whether the prosecution had proved "beyond a reasonable doubt that [Torres] actually possessed, used or threatened to use a revolver during the commission of the murder." The prosecutor argued:

> You know ... that the defendant had that gun in his vehicle. And you know that it was fired within the last eight hours. So the State submits that your answer to this question must be yes.

The jury ultimately answered the special interrogatory in the affirmative.

In rebuttal closing, the prosecutor referred to Agent Robbins's time-frame testimony and Agent Robbins's experience with revolvers:

> Mr. Robbins has fired thousands of rounds. He's been, you know, qualified on the revolver for over—for twenty years. He has been an agent for forty years.
>
> And that's what he knows, that the gun was fired within the last eight hours. He couldn't be shaken from that testimony. He was definitely sure it had to have been fired within the last eight hours. So ask yourself that. Why were there three spent cartridges left in the revolver? Unless it had been recently fired and that that gun was used to kill Ruben Gallegos.

Under the circumstances of this case, we cannot say that the circuit court's error in admitting Agent Robbins's time-frame testimony was harmless beyond a reasonable doubt.[15] We conclude that "there is a reasonable possibility that the [circuit court's error] might have contributed to [Torres's] conviction." *State v. Kassebeer*, 118 Hawai'i 493, 505, 193 P.3d 409, 421 (2008) (quotation marks and citation omitted).

## V. The Circuit Court Did Not Err in Instructing the Jury on Circumstantial Evidence.

During jury selection, the circuit court read the following instruction on circumstantial evidence to the jury:

> Before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions points to innocence and the other to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable.

---

15. We note that in its brief on appeal, the State only argued that the circuit court did not err in admitting the time-frame testimony and did not contend that any error in admitting such testimony should be viewed as harmless. During oral argument, the State argued that any error in admitting Agent Robbins's time-frame testimony was harmless.

At the close of the case, Torres offered two alternative circumstantial evidence instructions that included the same language contained in the circumstantial evidence instruction given during jury selection. Torres argued that he was entitled to an instruction that included such language because the State was relying heavily on circumstantial evidence to prove its case. The circuit court refused to give either of Torres's proposed instructions. The circuit court's final instructions to the jury included instructions on direct and circumstantial evidence, the presumption of innocence, and the burden of proof. After charging the jury with the final instructions, the circuit court directed the jury to disregard the circumstantial evidence instruction the court had given during jury selection and to follow the final instructions given by the court.

Torres argues that the circuit court erred by refusing to give either of the two jury instructions on circumstantial evidence proposed by the defense at the close of the case. Torres does not contend that the circuit court's instructions to the jury on direct and circumstantial evidence, the presumption of innocence, and the burden of proof misstated the law. Rather, he argues that he was entitled to an additional instruction that included the requested language contained in the instruction given during jury selection. We disagree with Torres's argument.

In *State v. Bush,* 58 Haw. 340, 569 P.2d 349 (1977), the Hawai'i Supreme Court held that no additional instruction on how to evaluate evidence susceptible of two reasonable conclusions was required, where the instructions given by the trial court adequately explained the burden of proof and the differences between direct and circumstantial evidence. *Id.* at 340–44, 569 P.2d at 350–52. The instruction requested by the defense in *Bush* was similar to the instructions requested by Torres and provided, in relevant part, as follows:

> If the evidence in this case is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt.

*Id.* at 341 n. 2, 569 P.2d at 350 n. 2. In upholding the trial court's refusal to give the requested instruction, the supreme court applied the rule that "where a given proposition of law is requested to be given in an instruction, the instruction may properly be refused where the same proposition is adequately covered in another instruction that is given." *Id.* at 342, 569 P.2d at 350 (quotation marks and citation omitted).

In *Bush,* the trial court gave an instruction on direct and circumstantial evidence that stated:

> Direct evidence means evidence that directly proves a fact without any inference or deduction having to be made in order to prove that fact.
>
> Circumstantial evidence consists of proof of certain facts or circumstances from which a reasonable inference or deduction can be made that another fact is true.
>
> It is not necessary that facts be proved by direct evidence. They may be proved also by circumstantial evidence, or by a combination of both direct evidence and circumstantial evidence. Both direct evidence and circumstantial evidence are acceptable as means of proof. Neither is entitled to any greater weight than the other.

*Id.* at 341 n. 3, 569 P.2d at 350 n. 3.

The supreme court concluded that the trial court's instruction on direct and circumstantial evidence adequately advised the jury on how to distinguish between and to use direct and circumstantial evidence. *Id.* at 341, 569 P.2d at 350. The court further concluded as follows:

> the trial court gave the jury instructions on the state's burden to prove the defendant guilty beyond a reasonable doubt. *The part thereof relevant to the instant case reads, " . . . it places upon the prosecution the burden of proving a defendant guilty beyond a reasonable doubt of every material element of the crime charged."* This passage includes within its ambit the tenor of [the instruction requested by the defense]. If the jurors were to find the

**34**

defendant guilty beyond a reasonable doubt as to every material element, of necessity they would have had to resolve evidence susceptible to two constructions unfavorable to defendant. There is before us neither evidence nor a contention that the jury did otherwise than as instructed. We conclude that the instruction requested by the [defense] which was refused stated the same proposition of law as that contained in the trial court's instructions.

*Id.* at 342–43, 569 P.2d at 350–51 (footnote and parenthetical information omitted) (ellipsis points in original) (emphasis added).

■ In Torres's case, the instruction given by the circuit court on direct and circumstantial evidence was substantively very similar to the instruction found adequate in *Bush.* The instruction given in this case properly informed the jury of the distinction between direct and circumstantial evidence and the use of such evidence. In addition, the circuit court instructed the jury on the burden of proof in language that was essentially the same as the language the supreme court emphasized and relied upon in *Bush.* The circuit court in this case advised the jury that the presumption of innocence "placed upon the prosecution the duty of proving every material element of the offense charged against [the] defendant beyond a reasonable doubt." [16] Based on *Bush,* we conclude that the circuit court did not err in refusing to give the circumstantial evidence instructions proposed by Torres. *See id.* at 340–44, 569 P.2d at 350–52; *State v. Gaston,* 108 Hawai'i 308, 119 P.3d 616 (App.2005) ("Generally, a case of circumstantial evidence does not require, in addition to a general instruction on proof beyond a reasonable doubt applicable to both direct and circumstantial evidence, instruction that the circumstantial evidence be inconsistent with every reasonable hypothesis of innocence or foreclose the hypothesis of innocence." (quotation marks and citations omitted)).

We also reject Torres's claim that the circuit court's final jury instructions were "confusing and misleading" because the court gave a circumstantial evidence instruction containing the requested language during jury selection, but refused to give an instruction that included the same language at the close of the case. The circuit court directed the jury to disregard the initial circumstantial evidence instruction given during jury selection and to follow the final instructions given at the close of the case. The final instructions adequately and correctly stated the law. We conclude that the actions of the circuit court did not render the final jury instructions confusing or misleading.

## CONCLUSION

We affirm the circuit court's decision to deny Torres's motion to suppress the evidence obtained as the result of the search of Torres's car. Because we conclude that the circuit court erred in admitting Agent Robbins's time-frame testimony, we vacate the circuit court's Judgment of Conviction and Sentence, and we remand the case for a new trial and for further proceedings consistent with this opinion.

---

**16.** The circuit court's complete instruction on the presumption of innocence and the burden of proof, of which the quoted text was only a small part, correctly set forth the law.