# IN THE COURT OF APPEALS OF IOWA

No. 18-1471
Filed December 18, 2019

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MICHAEL LEE SYPERDA,**
        Defendant-Appellant.

_____

        Appeal from the Iowa District Court for Henry County, Mark Kruse, Judge.


        A defendant appeals his conviction for first-degree murder.  **JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**


        Mark C. Smith, State Appellate Defender, (until withdrawal), and Maria Ruhtenberg, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee.


        Heard by Doyle, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge.**

This is a murder case without a body.  Michael Syperda does not contest that Iowa follows the no-body-required rule in prosecuting homicides.  But he argues the State did not prove beyond a reasonable doubt his estranged wife Elizabeth was dead or that he killed her.[1]  Because the totality of evidence supports the district court's finding that Michael acted with malice aforethought to cause Elizabeth's death, we affirm his murder conviction.  But because the State did not prove beyond a reasonable doubt that Michael acted with the specific intent to kill, we reverse the first-degree murder conviction and remand for entry of judgment and sentence on second-degree murder.

Through appellate counsel, Michael also challenges the district court's suppression ruling and its admission of prior-bad-acts evidence.  We decline to reverse the district court on those grounds.  Finally, contrary to the State's position, we do not believe new legislation bars us from considering Michael's pro se supplemental brief.  That brief raises several claims of ineffective assistance of trial counsel—one of which we reject for lack of prejudice and the remaining claims we preserve for possible postconviction-relief (PCR) proceedings.

## I.  Facts and Prior Proceedings

Elizabeth Syperda went missing on July 16, 2000.  She was living in Mt. Pleasant and had recently separated from her husband, Michael.  They met when Elizabeth was thirteen years old and lived in the same Truckee, California, neighborhood as Michael's family.  Michael hired Elizabeth to babysit his two

---

[1] Because the defendant and victim share a surname, for clarity's sake, we will refer to them by their first names in this opinion.

children. After a few years, Michael and his family moved to Winfield, Iowa. Michael decided to bring along then seventeen-year-old Elizabeth. Elizabeth's mother, Donna Forshee, was against the move and tried to dissuade her daughter from going, even calling child-protection services. But to no avail. Donna maintained a long-distance relationship with her daughter after the move.

In Iowa, Elizabeth graduated from high school in May 1997. Donna attended the ceremony and gave her daughter an emerald and diamond ring as a graduation gift. Elizabeth cherished that ring.

Meanwhile, Michael divorced his then wife, Sally Crill, and started a romantic relationship with Elizabeth. Around the same time, Elizabeth became friends with Harper Tracey through their church. During their friendship, Tracey noticed injuries to Elizabeth on five or six occasions. Those injuries included finger marks on Elizabeth's neck and bruising on her abdomen. Tracey's daughter, Sadee, knew Michael's children through church and would sometimes play at their house in Winfield. When she was about seven, Sadee remembers visiting the Syperda children and seeing Michael "shove" Elizabeth down a flight of stairs onto her knees.

Tracey also recalled an incident when Elizabeth came to her trailer "frantic and scared" after fleeing a violent altercation at Michael's house. Elizabeth confided she was afraid of Michael and "couldn't take any more of the abuse." Tracey noticed Elizabeth's abdomen was "very bruised" and she had marks on her arms. Elizabeth stayed a full month with Tracey in her trailer.

During that month, Michael drove to the trailer almost every day to engage in intimidation tactics. He would park his truck on the street, within ten steps of the trailer, and "taunt" Elizabeth. Specifically, he made these threats:

> He would tell her that he would keep her from the children. He told her that he would get rid of her and nobody would care and nobody would find her. He would leave notes on the doorstep. He left a torn cat collar with a note that said if she didn't come back, she'd disappear like the cat. And threatened to hurt the animals, threatened her with videotapes and pictures that he had.

As many as six times, Tracey witnessed Michael threatening to kill Elizabeth and dispose of her body. Tracey called law enforcement to stop Michael's behavior but was unsuccessful.

Elizabeth eventually left the trailer to live with Michael. They married in January 1998. Tracey attended the wedding, despite having tried to dissuade Elizabeth from marrying him. Michael then cut off Tracey's contact with Elizabeth. Elizabeth eventually told Tracey not come to Michael's house anymore because those were Michael's instructions.

Tracey was not the only person worried about Elizabeth marrying Michael. Donna did not come to Iowa for her daughter's wedding because she did not approve of the relationship. But Elizabeth did visit California to celebrate her younger brother's high school graduation in June 2000. Still in Iowa, Michael started calling at all hours over the three days that Elizabeth stayed with her mother. Michael was not happy because he believed Elizabeth's mother was pressuring her not to return to Iowa.

To placate Michael, Elizabeth decided to leave Donna's house and stay with her childhood friend, Shannon Gerber. Gerber had stayed in touch with Elizabeth

since her move to Iowa. They tried to talk monthly by "sneaking in phone calls when Mike wasn't around." Michael shifted his calling to Gerber's house, leaving so many messages that they filled Gerber's answering machine. Gerber recalled the majority of the calls were threats. Michael yelled at Elizabeth and threatened to kill her if she did not return home. Michael also threatened to kill Elizabeth's mother and brother as well as Gerber and her young son. The calls continued all hours of the day and night until Gerber's husband unplugged the phone. Gerber implored Elizabeth not to return to Iowa:

> I didn't want her to go because I was worried I would never see her again, and I took every back road I could possibly think of to the airport . . . to get her to miss her plane. . . . And her flight was delayed and she got on the plane.

Back in Mount Pleasant, Elizabeth took a job at Experian, where she met co-worker, Sara Thomas.[2] Thomas lived two blocks from the Syperdas' house. Thomas would pick up Elizabeth and drop her off after work. During those commutes, Thomas noticed bruises on Elizabeth's face, arms, and hands.

Thomas became romantically involved with Elizabeth despite the fact Thomas was then living with Terri Thrasher. Once when Michael was gone, his two children peeked through the keyhole and saw Thomas and Elizabeth having sex in Michael's bedroom. When the women learned the children had seen them, Elizabeth moved her belongings to Thomas's apartment.

That move upset both Michael—and Thrasher. When Thrasher returned to the apartment, she found more than thirty messages from Michael on the

---

[2] By the time of trial, Thomas went by her married name, though we will continue to refer to her by her maiden name in this opinion.

answering machine. In the first message, Michael begged Elizabeth to return home. But in the next few messages, he grew angry and cursed at her. When Thrasher went outside to walk the dog, Michael approached and asked her to call Thomas at work to get Elizabeth to come home. Thrasher complied.

When Elizabeth and Thomas reached the apartment, they saw Michael and Thrasher waiting for them. Scared, Elizabeth and Thomas sped away. Michael yelled at Thrasher to follow them. The two pairs faced off in a nearby Hy-Vee parking lot. Thrasher confronted Thomas. Michael approached Elizabeth—"cursing and screaming and threatening"—and dragged her out through the window of the car. During the struggle, Elizabeth suffered a lacerated rib, and her shirt was torn. Thomas and Elizabeth fled to a nearby gas station where they reported the assault to police. The State charged Michael with first-degree burglary and domestic-abuse assault. The court approved a no-contact order protecting Elizabeth.

In the following days, Elizabeth stayed at Thomas's apartment. Michael would sit across the street and yell at them or call them names. Thomas received numerous phone calls, but nobody would respond when she answered. She reported the calls to the police, who had the phone company put a "trap" on her line to register who was calling. Between June 26 and July 16, Michael called Thomas's apartment 162 times.

On the day Elizabeth disappeared, July 16, Michael started phoning the apartment around 3:00 in the afternoon, logging more than a dozen calls through the evening. He last called at 10:56 p.m. When Thomas left for work around 10:30 that night, Elizabeth was sleeping on the couch. When Thomas returned around

4:00 a.m., the front door was locked. And the dog was still penned in the bathroom like when she left the apartment. But Elizabeth was gone.

Not sure what to make of the situation, Thomas went to bed. When she woke up, she grew concerned that Elizabeth had not returned. Elizabeth departed without her purse, clothing, and other personal items. Elizabeth left no note. Thomas called the police and, after waiting the required twenty-four hours, filed a missing-person report.

On July 17, Michael was scheduled to work. His friend, Jarrod Krabill, was supposed to watch Michael's children. Krabill testified when he arrived at Michael's house around 5:30 a.m., he found Michael was "pretty intoxicated." Krabill testified Michael told him Elizabeth had stayed overnight and left around 5:00 a.m. Michael decided not to go to work that morning.

Police called Michael the next day, July 18, to ask if he had heard from Elizabeth. He said he had not. On July 20, officers came to his house to let him know she had been reported missing. Michael said it was coincidental he had taken a sick day from work on July 17—the day after Elizabeth disappeared. Michael also said "due to their break-up he hadn't been eating and had been getting cramps."

In early September 2000, Larry Hedlund, who was then an agent with the Iowa Division of Criminal Investigation (DCI), interviewed Michael. Michael told the agent he and Elizabeth "got along fine" and denied any abuse in their relationship. When asked about his June 16 assault on Elizabeth, Michael said "basically that it was out of character for him and that he mixed alcohol with his emotions and he shouldn't have done that." In a similar vein, Michael initially

denied making harassing phone calls to Thomas's apartment. But when confronted with phone records, Michael took responsibility for the calls. When the agent pointed out that Michael's calls to the apartment stopped on the night Elizabeth turned up missing, Michael got teary eyed and commented "his situation was not looking good."

In addition, Michael said he was "just trying to keep his ass out of jail" and "he didn't want to be blamed or held responsible for this." Michael took issue with Hedlund's suggestions Elizabeth was dead and insisted "he never hit a woman." The agent also recalled Michael casting aspersions on Elizabeth, saying "he didn't screw up, she did."

When asked about his access to vehicles, Michael told the agent his vehicle was "broken down" with some kind of clutch or fuel problem. Investigators later learned Michael was able to drive his Toyota Land Cruiser to the mechanic's shop on July 21.

After that interview, the police obtained a warrant to search Michael's home. In Michael's bedroom, police searched an unlocked safe. Either inside or on top of the safe, an officer located a gold "2000" pendant (that Michael had given Elizabeth) and the V-shaped emerald and diamond ring she received from her mother as a graduation gift. Thomas testified Elizabeth was sentimental about the ring and never took it off except to bathe.

When police renewed their investigation in 2013, Lieutenant Lyle Murray asked Michael about his possession of Elizabeth's prized ring. Michael said she must have left it behind when she moved out. When Officer Murray explained he

knew from a police photograph that Elizabeth was wearing the ring during the June 16, 2000 assault, Michael could not explain how it ended up in his bedroom.

When investigating her finances, police discovered Elizabeth had opened a bank account under her maiden name on July 7. Her last transaction occurred July 13. The account balance was $81.15 after her disappearance. Elizabeth never claimed her final paycheck from her job at Experian.

Since her disappearance in 2000, investigators searched seventy-nine different locations but never found Elizabeth's body. They entered Elizabeth's information in the National Crime Information Center (NCIC) missing-persons database. In the nearly two decades since Elizabeth disappeared, the database logged no "hits" nor was any information provided by family members, friends, or acquaintances.

After Lieutenant Murray probed Elizabeth's disappearance with "a new set of eyes," the State obtained a grand jury indictment charging Michael with first-degree murder in November 2017. He waived his right to a jury trial. After a bench trial, the district court found him guilty as charged. Michael moved for a new trial, alleging the court's verdict was against the weight of the evidence. The court denied that motion. Michael now appeals.

## II. Scope and Standards of Review

We review claims of insufficient evidence in bench trials no differently from those challenges in jury trials. *State v. Myers*, 924 N.W.2d 823, 826–27 (Iowa 2019). If substantial evidence supports the court's verdict, we will affirm. *Id.* We view the record in the light most favorable to the court's verdict. *Id.* Our substantial-evidence review is for errors at law. *Id.*

By contrast, we review the denial of a motion for new trial, alleging the verdict was against the greater weight of the evidence, for an abuse of discretion. *State v. Serrato*, 787 N.W.2d 462, 471–72 (Iowa 2010). The weight of the evidence differs from a substantial-evidence standard. *Id.* We do not review the denial of a new trial in the light most favorable to the State. *Id.*

We likewise review the district court's admission of prior-bad-acts evidence for an abuse of discretion. *State v. Richards*, 879 N.W.2d 140, 145 (Iowa 2016). That standard means "we give a great deal of leeway to the trial judge who must make [a] judgment call." *State v. Newell*, 710 N.W.2d 6, 20–21 (Iowa 2006). Even if we find an abuse of discretion, we will only reverse if the error was prejudicial. *State v. Reynolds*, 765 N.W.2d 283, 288 (Iowa 2009).

We perform a de novo review of the district court's denial of the motion to suppress. *State v. Johnson*, 756 N.W.2d 682, 686 (Iowa 2008). But we do not make an independent determination of probable cause. *Id.* Rather, we decide whether the judge issuing the warrant had a substantial basis for concluding probable cause existed. *State v. Gogg*, 561 N.W.2d 360, 363 (Iowa 1997).

That same de novo standard of review applies to the claims of ineffective assistance of counsel. *See State v. Macke*, 933 N.W.2d 226, 230 (Iowa 2019).

## III. Analysis

### A.      Sufficiency of the Evidence

Michael raises both a sufficiency-of-the-evidence and a weight-of-the-evidence argument. A conviction rests upon insufficient evidence when, even after viewing the evidence in the light most favorable to the State, no rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v.*

*Reeves*, 670 N.W.2d 199, 202 (Iowa 2003). On the other hand, weight of the evidence refers to a determination that a greater amount of credible evidence supports one side of an issue than the other. *Id.* Michael challenges the State's evidence that Elizabeth is dead, as well as its proof that he was the person who killed her. We will address Michael's sufficiency claim first, and then turn to his weight-of-the-evidence issue.

In its fifty-six-page ruling, the district court first summarized the testimony of the sixteen prosecution and five defense witnesses. The court then explained that to convict Michael of first-degree murder, the State was required to prove beyond a reasonable doubt these elements:

> (a)  On or about July 16, 2000, Michael Syperda did an act that caused the death of Elizabeth Syperda.
> (b)  Michael Syperda acted with malice aforethought.
> (c) Michael Syperda acted willfully, deliberately, premeditatedly, and with a specific intent to kill, Elizabeth Syperda.

### 1.    Elizabeth's Death

In analyzing those elements, the court started with the logical question—did the State prove beyond a reasonable doubt that Elizabeth was dead? It has long been Iowa law that the State must show the corpus delicti—that is the body of the crime—by proof beyond a reasonable doubt.[3]  *See State v. Keeler*, 28 Iowa 551, 553 (1870). But that proof may be either direct or circumstantial. *Id.* (disapproving jury instruction in murder case that required evidence to be "direct and positive");

---

[3] Corpus deliciti "is made up of two elements: First, that a certain result has been produced, as that a man has died, or a building has been burned, or a piece of property is not in the owner's possession; second, that [someone] is criminally responsible for the result." *State v. Millmeier*, 72 N.W. 275, 277 (Iowa 1897).

*see also State v. Townsend*, 182 N.W. 392, 394 (Iowa 1921) (upholding murder conviction though State did not offer testimony identifying body recovered from river by witnesses who knew victim during his lifetime).

At oral argument, defense counsel acknowledged that recovering a dead body is not a necessary condition for establishing murder. *See State v. Torres*, 222 P.3d 409, 420 (Haw. Ct. App. 2009) (collecting cases from many jurisdictions that follow the "no-body-required" rule). But Michael continues to question the State's proof that Elizabeth is dead. The district court found the State proved her death beyond a reasonable doubt.[4] The court reasoned: "Any argument that Elizabeth is just waiting to be found or may come walking through the door at any moment or may make a call to her mother at any moment is little more than fantasy."

We find substantial evidence in the record to support the district court's finding. Elizabeth was a healthy twenty-two-year-old when she vanished. *See Commonwealth v. Burns*, 187 A.2d 552, 555 (Pa. 1963) (considering victim's good health before her disappearance as factor in upholding murder conviction where authorities found no body). Despite warm, ongoing relationships, Elizabeth's family and friends never heard from her again after July 16, 2000. *See State v. Lindsey*, 738 So. 2d 974, 977 (Fla. Dist. Ct. App. 1999) (finding significance in fact that absence without contacting family or friends was out of character for victims); *see also Gov't of Virgin Islands v. Harris*, 938 F.2d 401, 416 (3d Cir. 1991) (noting victim had "regularly maintained contact with her children, other family, and

---

[4] The district court also found her death was not accidental but caused by the actions of another.

friends"); *Hurley v. State*, 483 A.2d 1298, 1305 (Md. Spec. App. 1984) (endorsing proposition factfinder may consider "unlikelihood that an absent person, in view of his health, habits, disposition and personal relationships would voluntarily flee, 'go underground,' and remain out of touch with family and friends" citations omitted).

The evidence did not support a theory that Elizabeth simply moved away. The NCIC missing-persons database yielded no clues. And since her disappearance in 2000, investigators searched nearly eighty different locations but never found Elizabeth's body. *See Commonwealth v. Smith*, 568 A.2d 600, 605 (Pa. 1989) (noting police conducted diligent search to ascertain whereabouts of missing children "to no avail"). The court also heard evidence Elizabeth opened a checking account in her maiden name nine days before her disappearance but never cashed her last paycheck from Experian. We agree with the district court that the evidence shows Elizabeth lacked the inclination or the resources to hide for the past eighteen years. Based on the available circumstantial evidence, we find substantial support for the conclusion that Elizabeth is dead.

### 2. Michael's Act

The district court also decided the State proved beyond a reasonable doubt that Michael committed an act that caused Elizabeth's death. The court reached that decision after taking meticulous measure of the totality of evidence.

We start with the court's examination of Michael's motive. While motive is not an essential element of murder, motive evidence is always relevant. *See State v. Campbell*, 239 N.W. 715, 719 (Iowa 1931). Michael's motive to kill Elizabeth is

plain from his history of exerting power and control over her.[5] That control started when Elizabeth was a teenager and moved with Michael's family to Iowa against her own mother's wishes. It continued after Michael divorced his wife and developed an intimate relationship with Elizabeth. That relationship was shaped by Michael's efforts to isolate Elizabeth from her friends. She had to "sneak" in phone calls with her childhood friend from California when Michael was away and Michael forbade Elizabeth's friend Tracey from visiting their house.

That relationship also featured violent outbursts by Michael, including pushing Elizabeth downstairs. Friends often saw visible injuries to Elizabeth, including bruising on her abdomen and neck.[6]

Whenever Elizabeth tried to leave Michael, he waged campaigns of intimidation against her.[7] In late 1997, he stalked her at Tracey's trailer, repeatedly threatening to kill her and make her body disappear. Tracey testified Michael left a torn pet collar with a note that said if Elizabeth did not come back, she'd vanish like the cat. Michael could not stand being in the absence of Elizabeth's company. Again in June 2000, when she went to California for her brother's graduation, Michael called incessantly. He threatened to kill not only Elizabeth, but also her

---

[5] Our supreme court has recognized that "domestic violence is a means to achieve power and control by the abuser and once successfully used engenders additional incidents of abuse." *See State v. Taylor*, 689 N.W.2d 116, 129 n.6 (Iowa 2004) (paraphrasing *Final Report of the Supreme Court Task Force on Courts' and Communities' Response to Domestic Abuse*, at 8 (August 1994)).

[6] Experts have found strangulation is "one of the best predictors for the subsequent homicide of victims of domestic violence." Gael B. Strack, Casey Gwinn, *On the Edge of Homicide: Strangulation As A Prelude*, 26 Crim. Just. 32, 34 (Fall 2011).

[7] Our supreme court also has accepted "statistically, a battered woman is in the most danger when she tries to leave an abusive relationship." *Linn v. State*, 929 N.W.2d 717, 732 (Iowa 2019) (quoting *State v. Rodriquez*, 636 N.W.2d 234, 245 (Iowa 2001) (crediting expert testimony)).

mother, her brother, her friend, her friend's husband, and her friend's child. And later that summer, when Elizabeth moved in with Thomas, Michael again showed up on the street, cursing and name-calling. He also telephoned the apartment relentlessly sometimes leaving threatening messages and often just hanging up.

His behavior did not end at mere threats. Michael publicly assaulted Elizabeth without fear of consequences. He also repeatedly violated a no-contact order protecting Elizabeth. His willingness to act on his obsession with Elizabeth reasonably persuaded the district court that he was the person who caused her death. *See Harris*, 938 F.2d at 417 (upholding murder conviction in no-body case and highlighting defendant's history of verbal threats and violence against his wife).

Other threads of evidence bolster the court's conclusion that Michael was responsible for Elizabeth's demise. For example, Michael made several inconsistent or question-begging statements to the police, both in 2000 and again when the police circled back to him in 2013. *See People v. Bierenbaum*, 748 N.Y.S.2d 563, 578 (N.Y. App. Div. 2002) (finding defendant's "lies, misstatements and omissions powerfully bespeak his consciousness of guilt"). First, Michael denied any abuse in their relationship despite dragging Elizabeth from a car window less than a month earlier. When called out on that inconsistency, Michael falsely claimed the assault was "out of character." Second, Michael denied making harassing calls until confronted with the phone-trap records. When caught in that lie, Michael "got teary-eyed" and admitted his situation was "not looking good." Michael told the DCI agent that "he was just trying to keep his ass out of jail." Michael also suggested he did not "screw up" but his missing wife did. In addition, Michael volunteered that it was "coincidental" he missed work the morning

Elizabeth disappeared. While not blatant admissions, these statements—viewed in context—reveal a consciousness of guilt on Michael's part.

During his interview in 2013, Officer Murray asked Michael how Elizabeth's prized emerald and diamond ring ended up in his bedroom. He initially said she left it behind when she moved out. But when confronted with evidence she was wearing it when he assaulted her at Hy-Vee, Michael could not explain his possession of the ring. The district court found it "inconceivable that she would have voluntarily left this particular ring in a safe, in a box, in the home of Mr. Syperda who could not explain how it got there." The court inferred from that evidence that when Michael disposed of Elizabeth's body, "[t]he V-shaped ring was kept and not disposed of with the body." On appeal, Michael rejects the notion the ring was a "smoking gun" in the murder case. Instead, he plays down its impact, noting Elizabeth continued to visit his house days before her disappearance.

We find support for the district court's inference that the ring linked Michael to Elizabeth's murder. Given her attachment to the ring, it would be hard to assume she simply forgot it at Michael's place and made no attempt to reclaim it before she disappeared. Given Michael's fixation on Elizabeth, it would be hard to assume that he chose to place the ring in his safe rather than use it as an excuse to meet with her. We believe the district's court explanation for Michael's possession of the ring is reasonable. It was fair for the factfinder to infer Michael recouped the ring before disposing of Elizabeth's body and did not anticipate the appearance of a picture showing the ring on Elizabeth's finger a few weeks before her disappearance.

We turn next to Michael's opportunity to kill Elizabeth. The State offered evidence Michael was the last person to talk to her. He admitted their last conversation was at 10:56 p.m. on July 16. The district court also credited Krabill's word that Michael told him Elizabeth spent that night at Michael's house. Adding to these dubious circumstances, Michael unexpectedly missed work on July 17.

And Michael's calls to the apartment never resumed—though police did not officially inform him that Elizabeth was missing until July 20. Michael suggests his pattern of calling Elizabeth was irregular because he made no calls from July 8 to July 13. He urges the cessation of calls after her disappearance was consistent with his past behavior. The trier of fact could reasonably have found the more compelling explanation was Michael stopped calling Elizabeth because he knew she was dead. *See Elleby v. State*, No. 03-K-16-004625, 2019 WL 4187727, at *1 (Md. Ct. Spec. App. Sept. 4, 2019) (upholding second-degree murder conviction on circumstantial evidence defendant "abruptly stopped his usual practice of obsessively calling" his girlfriend, he was last person to see her alive, and threatened to kill her a week earlier).

When viewed in its entirety, the State's evidence added up to proof beyond a reasonable doubt that Michael's actions—undefined as they are—caused Elizabeth's death. The district court was reasonable in venturing: "There are many ways in which a person can be killed suddenly and without leaving blood. A body can be disposed of in such a manner that it is unlikely to be found." When taken together, the evidence of Michael's motive and opportunity and "proper inferences therefrom" are sound proof that he killed Elizabeth. *See id.* at *8 ("[C]ircumstantial

evidence does not depend upon one strand, but is made up of a union and combination of the strength of all its strands.").

### 3.    Michael's Intent

We next examine whether the State offered substantial evidence of Michael's state of mind.  To prove murder, the State was required to show Michael acted with malice aforethought.  *See* Iowa Code § 707.1 (2000) ("A person who kills another person with malice aforethought either express or implied commits murder").  To prove murder in the first degree, the State was required to show Michael not only acted with malice aforethought, but killed Elizabeth "willfully, deliberately, premeditatedly and with a specific intent to kill."  *State v. Freie*, 335 N.W.2d 169, 172 (Iowa 1983) (citing §§ 707.1, (1981)).[8]

Michael argues the State's evidence falls short of establishing he acted with malice aforethought, or that he did any act willfully, deliberately, premeditatedly and with the specific intent to kill Elizabeth.  We believe the State offered adequate proof of malice aforethought.  But we find merit in Michael's claim the State's evidence is too thin to support a verdict of murder in the first degree.

To begin, we define malice aforethought as a fixed purpose or design to physically harm another person that the defendant harbors before committing the crime.  *See State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003).  But that intent to inflict harm need not exist for any particular length of time.  *See State v. Artzer*, 609 N.W.2d 526, 530 (Iowa 2000).  In fact, the relationship between the state of

---

[8] Deliberate means to weigh in one's mind, to consider, contemplate, or reflect; premeditate means to think or ponder a matter before acting.  *State v. Hamilton,* 309 N.W.2d 471, 480 (Iowa 1981).

mind known as malice aforethought and the homicidal act is more accurately characterized as causal than temporal. *See State v. Bentley*, 757 N.W.2d 257, 265 (Iowa 2008). "In other words, the malice must result in the homicidal act." *Id.*

Here, the State offered sufficient evidence that Michael's malice toward Elizabeth resulted in the homicidal act. Because Michael was possessive and controlling of Elizabeth, it was more likely he acted with a fixed purpose to do her physical harm when she left him for another intimate partner. *See State v. Newell*, 710 N.W.2d 6, 21 (Iowa 2006). Evidence of an acrimonious relationship is "highly relevant to the issue of malice aforethought." *Id.* The State offered proof Michael repeatedly threatened to kill Elizabeth and to dispose of her body so no one would find her. The trier of fact could infer from those persistent threats that Michael put some thought into the act of killing Elizabeth. That type of thought qualifies as malice aforethought. Substantial evidence supports the court's verdict on murder.

But was it first-degree murder? "The difference between first-degree murder and second-degree murder is that the former requires specific intent to kill, whereas the latter requires only a general criminal intent." *State v. Klindt*, 542 N.W.2d 553, 555 (Iowa 1996). A crime requires proof of specific intent when the statute describing the proscribed act refers to an intent to achieve some additional consequence. *See State v. Hanes*, 790 N.W.2d 545, 556 (Iowa 2010). "The specific intent is linked to the proscribed act and therefore must be present at the time of the proscribed act." *Id.* In other words, the State must show a temporal relationship between the homicidal act and the specific intent to kill.

In finding proof of first-degree murder, the district court reasoned: "This intention to kill was expressed many times before July 17, 2000 and did not arise

suddenly or in the heat of passion but from thought and planning by an enraged and obsessive person." The court misconstrues the intent-to-kill element. The State was required to prove Michael's specific intent to kill existed at the time of the homicidal act; it is improper to suggest "the defendant's specific intent may exist at any time." *Id.* Because the State offered no proof how Michael killed Elizabeth, it did not link his intent to kill with any given act. With no physical evidence and no confession, we don't know if Michael's expressed intent to kill Elizabeth coincided with a premeditated act. Perhaps Michael took her life "in a spur-of-the-moment act" or because he "panicked" or acted in "the anger of the moment." Those scenarios would justify a verdict of only second-degree murder. *See State v. Reese*, 259 N.W.2d 771, 779 (Iowa 1977).

After viewing the evidence in the light most favorable to the State, we find substantial support for a verdict of second-degree murder. The State successfully wove together numerous strands of circumstantial evidence to show Elizabeth was dead and it was Michael who acted on his malice aforethought to kill her. But on this record, first-degree murder is going a bridge too far.[9] We reverse the first-degree murder conviction and remand for entry of judgment and sentence on second-degree murder. *See generally State v. Morris*, 677 N.W.2d 787, 788–89 (Iowa 2004) (approving remand for entry of amended judgment of conviction on lesser-included offense when trier of fact necessarily found the State established all elements of lesser offense).

---

[9] Cornelius Ryan, *A Bridge Too Far* (1974).

**B.      Weight of the Evidence**

Michael argues even if the record contained sufficient evidence of his guilt when viewed in the light most favorable to the State, the verdict was contrary to the weight of the evidence.  We only need to evaluate that argument as to second-degree murder, having found insufficient evidence for the greater offense.

Michael focuses on the shaky credibility of witness Krabill.[10]  Krabill told the grand jury Michael did not say Elizabeth had been at his home the morning of July 17 but corrected that testimony at the bench trial.  After a healthy discussion of Krabill's foibles, the district court expressed its belief in Krabill's trial testimony.  We defer to that credibility finding.

Michael opted for a bench trial in this case, so the district court assessed witness credibility in reaching its verdict.  *See State v. Wickes*, 910 N.W.2d 554, 571 (Iowa 2018).  "The granting of a new trial based on the conclusion that a verdict is against the weight of the evidence is reserved for those situations in which there is reason to believe that critical evidence has been ignored in the fact-finding process."  *State v. Grant*, 722 N.W.2d 645, 648–49 (Iowa 2006).

Here, the district court carefully reviewed all of the testimony in its findings of fact.  The court did not ignore any critical piece of evidence in reaching its verdict in this murder case.  *See id.*  The district court had wide discretion in deciding the motion for new trial.  *See State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998).  Because we find no abuse of that discretion, Michael is not entitled to a new trial on second-degree murder.

---

[10] Krabill had convictions for crimes of dishonesty and harbored ill will toward Michael after finding out—after 2000—that Michael had an affair with Krabill's wife.

**C.     Motion to Suppress**

Having found substantial evidence to support the offense of second-degree murder, we turn to Michael's challenge to the search warrant.  The police found jewelry belonging to Elizabeth inside or on top of an unlocked safe in Michael's bedroom while executing a warrant in September 2000.  Among the jewelry was the prized emerald and diamond ring she received from her mother as a graduation gift.  The police also seized a necklace with a "2000" pendant Michael gave her.  Michael contends the jewelry should have been suppressed because police lacked probable cause to search his home.

The Fourth Amendment requires probable cause for a search warrant.[11]  The test for probable cause is whether a person of reasonable prudence would believe a crime was committed on the premises to be searched or evidence of a crime could be located there.  *Gogg*, 561 N.W.2d at 363.  Michael asserts the State did not meet that test here because the undated affidavit attached to the warrant application did not suggest any crime had been committed, much less at his residence.

The application explained the circumstances of Elizabeth's disappearance on July 16.  It also noted Michael did not report to work on July 17 saying he had a "long" night.  The affidavit highlighted inconsistent statements Michael offered police about his last conversations with Elizabeth.  The affidavit also detailed Michael's assault on Elizabeth one month earlier in the Hy-Vee parking lot.  In addition, the affidavit provided information about Michael's intimidation of his ex-

---

[11] In moving to suppress, Michael invoked both the federal and state constitutions.  On appeal, he does not argue a different standard or reasoning between the two provisions.

wife, Sally, including a threat to "kill her and bury her, and no one would ever find her." The State claims the totality of those circumstances justified the magistrate in finding probable cause to search Michael's house.

"Probable cause does not require certainty beyond a reasonable doubt that a crime is being or has been committed." *Carter v. MacMillan Oil Co., Inc.*, 355 N.W.2d 52, 57 (Iowa 1984). When considering the totality of circumstances as presented in the application, we ask whether common-sense inferences to be drawn from those circumstances could lead a person of reasonable prudence to believe evidence of a crime could be located in the place to be searched. *See State v. McNeal*, 867 N.W.2d 91, 102 (Iowa 2015). Because the Fourth Amendment values the practice of obtaining a warrant to reduce the perception of intrusive police conduct, we do not strictly scrutinize the sufficiency of the underlying affidavit. *Id.* at 100. Instead, we decide whether the issuing magistrate had a substantial basis for concluding probable cause existed. *Id.*

Here, we find those common-sense inferences would lead a reasonably prudent person to believe evidence of a crime may have been found at Michael's house. Elizabeth had lived at that house. The affidavit highlighted Michael's attack on Elizabeth just one month before her disappearance. Michael made deceptive statements to police about the harassing phone calls he made to Elizabeth's new residence since that assault. Those statements belied a guilty knowledge. Michael skipped work the morning Elizabeth went missing. The totality of facts provided the magistrate with a substantial basis for concluding that officers would find evidence to support "foul play" in Elizabeth's disappearance. We affirm the suppression ruling.

### D.     Admission of Prior Bad Acts

Michael filed a motion in limine seeking to exclude evidence that he previously threatened or assaulted Elizabeth.  The court did not rule on the motion before trial.  During trial, the defense objected to several lines of inquiry as violating Iowa Rule of Evidence 5.404(b).[12]  For instance, counsel objected to evidence of (1) his assault on Elizabeth in the Hy-Vee parking lot one month before her disappearance, (2) an alleged assault in 1998 when he pushed Elizabeth down the stairs, (3) another instance in 1998 when he threatened and harassed Elizabeth, and (4) that she generally complained of his abuse.  The district court overruled those objections, finding the evidence relevant to Michael's motive and intent.

On appeal, Michael argues the district court abused its discretion in admitting that prior-bad-acts evidence.   He contends the State offered his propensity for violence and controlling conduct toward Elizabeth to show he was the person who killed her.  According to Michael, by doing so, the State misused the "intent" evidence to prove he acted in conformity with his bad character.  *See State v. Sullivan*, 679 N.W.2d 19, 27 (Iowa 2004) (explaining admissible evidence must bear directly on intent rather than passing through the filter of character and propensity).

---

[12] That rule provides:
> Crimes, wrongs, or other acts.
>> (1) Prohibited use.  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>> (2) Permitted uses.  This evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

The State contends our supreme court has treated prior-bad-acts evidence differently in domestic-violence cases. *See, e.g.*, *Newell*, 710 N.W.2d at 21 (finding evidence of defendant's prior controlling behavior toward murder victim "was highly relevant to the issue of malice aforethought"); *Taylor,* 689 N.W.2d at 125 (recognizing "logical connection" between defendant's intent at time of crime and past acts of violence); *State v. Rodriguez*, 636 N.W.2d 234, 242 (Iowa 2001) (noting evidence of defendant's prior violent acts towards victim coupled with his prior threats to kill her made it more probable he intended to cause serious injury). The State insists that in addition to proving his identity as the killer, Michael's threats and violence directed at Elizabeth revealed his malice aforethought.

After reviewing *Rodriguez*, *Taylor*, and *Newell*, we find no abuse of discretion in the district court's admission of the prior-acts evidence. Those cases were "not a retreat" from the *Sullivan* holding that prior-acts evidence must show more than a "mere propensity" for criminal conduct. *See Taylor*, 689 N.W.2d at 128 n.6. *Sullivan* advised that an "unconnected" prior crime could not be evidence of intent to commit the crime charged. 679 N.W.2d at 26. But domestic violence is a pattern of behavior where each incident is "connected to the others." *Taylor*, 689 N.W.2d at 128 n.6.

The disputed evidence in this case was material to Michael's identity as the perpetrator and to show his motive for the killing Elizabeth, not just to show his general propensity for criminality. *See Sullivan*, 679 N.W.2d at 25. The State offered clear proof he committed the prior acts. *Id.* And the State demonstrated a strong need for the prior-acts evidence in light of the contested issues at trial and the scant other evidence available to the prosecution. *Taylor*, 689 N.W.2d at 124.

Finally, the information's probative value was not substantially outweighed by the danger of unfair prejudice. *See* Iowa R. Evid. 5.403. Michael chose a bench trial, which greatly reduced the possibility the trier of fact would be unfairly influenced by the prior bad acts. *See State v. Casady*, 491 N.W. 2d 782, 786 (Iowa 1992); *see also State v. Richards*, 879 N.W.2d 140, 152 (Iowa 2016) (recognizing that a jury is more likely than a judge to decide a case on an improper basis). Michael is not entitled to relief on this evidentiary claim.

### E. Michael's Pro Se Supplemental Brief

In May 2019, Michael filed a pro se supplemental brief. In that brief, he echoes the argument advanced by his appellate attorney on the substantial-evidence claim. He also complains about the performance of his trial counsel, an issue appellate counsel did not raise.

Before considering the merits of that Sixth Amendment claim, we must decide if recent legislation (known as S.F. 589), effective July 1, 2019, has foreclosed our ability to consider those pro se materials because Michael is represented by counsel. *See* 2019 Iowa Acts ch. 141, § 30 (codified at Iowa Code § 814.6A(1) (2019)). That provision states: "A defendant who is currently represented by counsel shall not file any pro se document, including a brief, reply brief, or motion, in any Iowa court. The court shall not consider, and opposing counsel shall not respond to, such pro se filings." Iowa Code § 814.6A (2019). In its appellee's brief, the State argued we have no authority to consider the pro se filing after July 1, 2019.

Our supreme court asked the parties to file supplemental briefs on that issue. In response, the defense argued S.F. 589 did not apply to Michael's appeal

because the new legislation applies prospectively only. Alternatively, the defense asserted if S.F. 589 applies to this appeal, that application violates the separation-of-powers doctrine and Michael's right to due process. The State contends the new statute should apply here because it affects only the procedure of presenting legal issues to the appellate courts. The State further argues the legislature has authority to restrict the court's exercise of appellate jurisdiction and Michael does not have a constitutional right to "hybrid" representation on appeal.

Since the parties filed their supplemental briefs, the supreme court issued *State v. Macke*, 933 N.W.2d 226, 228 (Iowa 2019), which held other amendments in S.F. 589 (dealing with guilty pleas and ineffective assistance of counsel) did not apply retroactively to appeals pending on July 1, 2019. *Macke* upheld long-standing precedent that "unless the legislature clearly indicates otherwise, 'statutes controlling appeals are those that were in effect at the time the judgment or order appealed from was rendered.'" 933 N.W.2d at 231 (quoting *James v. State*, 479 N.W.2d 287, 290 (Iowa). Because we see no suggestion in *Macke* that the supreme court would treat section 814.6A(1) differently from the other amendments in S.F. 589, we conclude we may consider Michael's pro se brief filed before the effective date of the legislation. *See State v. Purk*, No.18-0208, 2019 WL 5790875, at *7n.8 (Iowa Ct. App Nov6, 2019).

Moving to the merits, to succeed on his ineffective-assistance-of-counsel claims, Michael must prove counsel failed to perform an essential duty and prejudice resulted. *See State v. Brown*, 930 N.W.2d 840, 855 (Iowa 2019). Michael believes his trial attorney should have fought the admission of Thomas's videotaped deposition in the place of her attendance at trial. The prosecutor

explained Thomas was "very pregnant" and her doctor ordered her not to travel more than ninety minutes from home. To facilitate her testimony, one week before the trial the parties agreed to take a "preservation deposition" near her home in Columbia, Missouri. *See* Iowa R. Crim. P. 2.13(2)(a) (allowing depositions of a prospective witness for use at trial under special circumstances).

On appeal, Michael asserts Thomas was not "unavailable" for confrontation clause purposes. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004) (explaining testimonial evidence is not admissible under the Sixth Amendment unless witness is unavailable and defense has had an opportunity to cross examine). He faults counsel for "acquiescing" to the State's plan to preserve her testimony.

Michael has not shown his trial attorney breached a material duty in agreeing to the video deposition. Nor has he shown prejudice. Trial counsel reasonably believed Thomas was unavailable because she was limited by doctor's orders from traveling to Henry County. *See Frankina v. Vasbinder*, No. 05-CV-71159, 2007 WL 1647925, at *9 (E.D. Mich. June 5, 2007) (finding no unreasonable application of federal law in state appellate decision declaring witness unavailable for confrontation clause purpose when she was in final three months of high-risk pregnancy and confined to bed rest). Moreover, Michael personally attended the deposition where his counsel cross examined Thomas at length. Michael cannot show he was prejudiced by allowing the witness to testify by video deposition.

Michael further alleges his trial attorney had insufficient time to prepare a defense and had a conflict of interest because counsel also represented him on burglary charges stemming from the June 2000 incident at Hy-Vee. Because the

record is not adequate to address these claims, we preserve them for possible PCR proceedings.

## IV. Summary

To recap, when viewed in the light most favorable to the State, substantial evidence supported the district court's verdict finding Michael guilty of murdering Elizabeth. But the State did not prove beyond a reasonable doubt that Michael acted with the specific intent to kill. Thus we reverse the conviction for murder in the first degree. We reject Michael's challenge to the search warrant and his objection to the prior-bad-acts evidence. On the pro se claims, we find counsel performed competently in handling Thomas's video deposition. But we preserve the remaining ineffective-assistance claims for PCR.

We thus affirm the judgment in part, reverse the judgment in part, and remand for Michael to be resentenced for murder in the second degree.

**JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**